## MEMORANDUM.

GEORGE GOULD *vs.* CHARLES GOULD.

THIS case is reported 36 Barbour, 270, when it came before the court on appeal from a judgment of the special term overruling a demurrer to the complaint. The judgment of the special term being affirmed, at the general term, the defendant put in an answer denying the material allegations of the complaint. The cause was then referred to B. W. Bonney, Esq. as sole referee, for hearing and decision; who reported that there was due to the plaintiff, from the defendant, the sum of $21.49 for principal and interest, and no more. The report of the referee was confirmed, at a special term of the court, and judgment was rendered in favor of the plaintiff, for that sum. From that judgment the plaintiff appealed to the general term.

*Thos. H. Rodman,* for the appellant.

*Jos. H. Choate,* for the respondent.

The following opinions, delivered at the general term, show what was the final disposition of the cause in this court.

LEONARD, J. The plaintiff, as assignee of Julia Gould, makes the mistake of requiring the defendant to pay the losses arising from bad investments of Julia's money a second time. In the settlements made with her, the defendant allowed all they had cost her. Had she brought an action, and established against the defendant bad faith in investing her money, as her agent, at the period of any of the several

settlements, or changes in the investments, she could have recovered no more than the defendant has paid her. She has been paid her original capital with interest, taking it when it was largest, at the time of the sale of the N. Y. Central R. R. investments. Assuming that she has been charged with investments a price greater than their actual worth, or market value at the time of the charge, these investments, when they afterwards proved bad, have in every instance been taken off her hands at a price equal to the amount with which she was charged, and interest. The transactions have been rescinded or settled, by returning the bonds or stock to the defendant, and receiving from him a sum equal to the original cost as charged to Miss Gould, and interest. The plaintiff, as her assignee, can have no second satisfaction of her damages, by now claiming to affirm transactions with the defendant which have been long ago disaffirmed and settled, when the defendant discovered that the investments had proved to be less profitable to Miss Gould than he had expected they would be. The transactions appear to have been honorable on the part of the defendant—he assuming the losses in every instance when the investment was not profitable.

In regard to the interest ($240) due on the 1st March, 1854, on the Alton bonds, they were entered in the account of that date, although the account was rendered in February preceding, showing that the bonds were sold, as of a date which did not carry the interest to the purchaser.

The judgment, appealed from by the plaintiff, should be affirmed with costs.

SUTHERLAND, J. The referee finds that the Michigan Southern rail road bond, and the Alton city bonds, were sold by the defendant to Julia Gould. I do not find any satisfactory evidence that these bonds were purchased *with*

Gould *v.* Gould.

*the funds of Julia.*     Without such evidence the plaintiff's case fails.

I concur in the conclusion arrived at by Judge Leonard.

CLERKE, J. also concurred.

Judgment affirmed.

[NEW YORK GENERAL TERM, May 2, 1864.   *Leonard, Clerke* and *Sutherland,* Justices.]

# APPENDIX.

## HON. JOHN SAVAGE, LL. D.,

FORMERLY CHIEF JUSTICE OF THE SUPREME COURT OF JUDICATURE,

Died at his residence in the city of Utica, on the 19th day of October, 1863, at the advanced age of eighty-four years.

On the next day, the following obituary notice appeared in the Utica *Morning Herald*, from the pen of the Hon. HIRAM DENIO, some time a Judge of the same court, now one of the Judges of the Court of Appeals.

"Judge SAVAGE was born at Salem, Washington county, in this state, on the 22d of February, 1779. He was of Scotch descent, his ancestors having emigrated to this country from the north of Ireland, to which they came at an earlier period from Scotland. He took his degree of Bachelor of Arts at Union College the last year of the last century, receiving the first honors of his class. Embracing the profession of the law, he was admitted to the bar after the usual probation, and commenced the practice in his native town. At that day the state was divided into large districts for the purpose of the administration of criminal justice, and Mr. SAVAGE was appointed district attorney for the district embracing the northern counties. His health becoming impaired, he made a voyage to Europe, and after spending some time in traveling, principally in Ireland, returned, and was reappointed to his former position of prosecuting attorney. In the year 1812 he was elected a member of the assembly from his native county. This, it will be recollected, was during the war with England, and at a time when party conflicts were unusually earnest and violent. He belonged to the political interest which supported the administration of Mr. MADISON and upheld the conduct of Governor TOMPKINS, and favored the vigorous prosecution of the war, which he believed to be a just

and necessary measure on account of the outrages committed by the British government upon our commerce and seamen. The assembly of that year embraced an unusual number of gentlemen of mark and talent, among whom may be mentioned the late Gov. BOUCK, SAMUEL YOUNG, DAVID B. OGDEN and others. The republican party, as the supporters of the administration were then called, was in a minority; and it may be stated as an evidence of the estimation in which Mr. SAVAGE was held at an early age, that he was selected, at the close of the session, to draw up the address of the minority, containing a declaration of their sentiments and a vindication of their principles and conduct, which duty he performed with marked ability. He subsequently served two terms as a representative in congress, having been first chosen in 1814 and re-elected in 1816. After the expiration of his last term, he was appointed comptroller of the state, to succeed ARCHIBALD McINTYRE who had held the place a great many years. It would be impossible in this brief sketch to particularize the various public measures in which Mr. SAVAGE participated, or which were originated by him. It may be mentioned, however, that the system of taxing corporations, as such, was originated by him while performing the functions of the office of comptroller. The practice had been to assume to assess the stockholders for their interests, along with the mass of their property, where such interests were known and the stockholders were residents of the state; but the large amount of money thus invested escaped almost entirely from contributing to the public burthens. The new system was adopted in consequence of an elaborate report from the comptroller, and has ever since been the established policy of the state.

While Mr. SAVAGE continued to execute the office of comptroller, the constitution of 1822 was adopted and went into operation. The changes effected by that instrument necessitated a complete reorganization of the judiciary, and Mr. SAVAGE was called to, and with considerable reluctance on his part accepted, the office of Chief Justice of the Supreme Court, to which he was appointed on the 29th of January, 1823; and he continued to hold that position until the latter part of the year 1836. It was in this office that the greatest distinction of his life was earned. Having served, a large portion of his time, before his appointment, in other walks of the public service, he did not consider that he possessed any peculiar qualifications as a judge; but those who controlled the question thought otherwise.

His labors were henceforth to be performed in the face of a learned bar, comprising many veteran lawyers, and with the disadvantage of

succeeding to the seat of a race of judges of great abilities and high reputation, of whom the state had justly been proud. But with a good legal education, unusual strong common sense and good judgment, and high powers of discrimination, together with patient study and investigation, added to perfect uprightness and integrity, he immediately overcame the slight embarrassments of his position, and by the unanimous verdict of the bar and the community, he was, to say the least, one of the best judges who ever presided in our highest legal tribunals. The character of his mind was that of great directness and simplicity. This quality enabled him at once to see the controlling point in a cause and to divest it of all extrinsic and superfluous considerations. His judgments, though generally the result of much study and reflection, appeared so obvious and natural when finally matured, as to command ready acquiescence. The nine volumes of Cowen's reports and the first fifteen volumes of the reports of Mr. Wendell, contain the evidences of his judicial labors, and together form a lasting monument to his memory. Among the opinions which exhibit his strong powers of judicial reasoning upon constitutional law, there is now recollected the one delivered in the court for the correction of errors in the case of *The Steamboat Company* v. *Livingston;* as also one exemplifying his admirable faculty of analysis upon recondite doctrines of the common law, in the case of *Patterson* v. *Ellis.*

The resignation of Judge SAVAGE was occasioned by the illness of his wife, which in his opinion demanded his personal care, and which resulted soon afterwards in her death. The only public employment in which he afterwards engaged, was a short term of service as a clerk of the supreme court in this city, to which he was appointed by the judges of the court in which he had presided. He afterwards removed to his farm at Salem, and again, after a few years, returned to this city, where he has spent his declining years in the tranquil enjoyment of domestic life, and under circumstances of as much comfort and happiness as his failing health and the infirmities of age would permit.

Judge SAVAGE had some marked peculiarities of character. He was reserved and diffident to a degree quite unusual in one who had mixed so much in public life, and had associated so largely with his fellow men. To a common acquaintance his manner would be considered cold, and he would be thought to lack enthusiasm of character and vigor of purpose. The contrary of all this was certainly the fact. Among intimate friends, and when not distracted by business and care, no man was more genial or interesting; and under a some-

what dry exterior, he possessed genuine warmth of heart. Scarcely any person had greater tenacity of purpose where questions of principle were concerned and his opinions had been formed, and they were usually made up upon subjects which affected society or the country. In common with all good men he was greatly affected at the condition of the nation in the present crisis; and he saw no safety for the union and for the preservation of free government on this continent, but in a steady support of the constituted authorities, and a vigorous prosecution of the war for the suppression of the rebellion.

It only remains to be stated that he died in a firm belief in the truths of Christianity and in a humble trust in the merits of the Redeemer."

----

The annexed notice, written by Dr. Asa Fitch, of Salem, was published in the *Salem Press*, on the 17th of November, 1863 :

" The Savage family is of French origin, *Sauvage* and *Sauvages* being the French orthography of what are probably portions of the same family, still existing in France. Being protestants, the revocation of the edict of Nantes is supposed to have been the occasion of their forsaking their native land. And intermarried as the family has now been, for three generations, with persons of Scottish descent, it has lost all the peculiar traits of the French character and shows prominently those of the Scottish race.

The great grandfather of Hon. John Savage, born in France, lived in North Ireland, in Londonderry or its neighborhood, according to the family tradition. He died, leaving three sons, who in their boyhood came with their mother and step father to this country, in 1717, the family settling at Rutland, Mass.

The two younger of these sons were twins, one of whom, Capt. John Savage, is buried in our old grave yard, his tombstone stating that he passed through 'many adventures, both by sea and land.' I doubt not every person in our town has remarked that inscription, and has felt a curiosity to know something of the adventures to which it alludes. Capt. Savage was ten years old when he came to this country, and followed the sea during the first part of his life. He gradually accumulated property until he became the sole owner of the vessel which he commanded. In a storm his vessel was wrecked on the island of Cape Breton; his cargo and men were all lost, he himself barely escaping with his life. Unwilling to trust the treacherous waves further, he abandoned the sea, married one of his step

father's daughters, and settled upon a farm in Pelham, Mass. He was there selected as captain of one of the Massachusetts companies of volunteers in the old French war, and served under Bradstreet in his expedition against Fort Frontenac, and under Gen. Abercrombie in his disastrous assault upon Ticonderoga. He was lame at the time of this latter engagement, but notwithstanding this, he placed himself at the head of his men and led them into the fight. His company was badly cut to pieces. At one point one of his men, Hugh Mc-Cartee, (afterwards a resident of our town,) was left standing almost alone, when Capt. Savage hallooed to him, 'Why don't you run and save your life!' To which McCartee shouted back to him in reply, 'It will be time for me to run when I see my lame captain flying. I have two sound legs left to me yet, and can soon overtake him.' And he heroically stood his ground until he saw the captain leading off the shattered remains of his command.

After residing twenty-two years in Pelham, Capt. Savage removed to this town in the early part of the settlement in the spring of 1767. He and Joshua Conkey had been appointed, by the proprietors of the town, their agents and attornies for disposing of their lands here, whereby his name comes to be signed to so many of the original title deeds under which the lands of the town are now held. He died January 27th, 1792, aged 85 years.

His second son, Hon. Edward Savage, was married on the last day of the year of their arrival here, to Mary, youngest child of Alexander McNaughton, Esq., (or McNachten as the name was formerly written,) who lived on the present Deacon Samuel Dobbin farm two miles west of East Greenwich. Esq. McNaughton was a leading man in the large ·company of emigrants which Capt. Laughlin Campbell brought from Argyleshire, Scotland, in 1739 and 1742, to whom, after long and vexatious delays, the present town of Argyle was granted. He was one of the five trustees on whom the arrangement of the affairs of the town was conferred by its charter, and was the first justice of the peace in this county. Upon the coming on of our revolutionary contest, he and most of his family connections adhered to the cause of the king, while his son in law, Savage, zealously espoused the cause of the country, and was intimately associated with Gen. Williams, Judge Webster, Col. McCracken and others, in guiding this county through those perilous times. He was the first sheriff of the county after the royal authority was subverted, was a member of the legislature twenty-one years, a member of the old council of appointment three terms, not to mention the numerous minor positions

of honor and responsibility which in the course of his long life he occupied, both in church and state. He died October 13, 1833, aged 87 years.

His only son, Hon. JOHN SAVAGE, a sketch of the leading incidents of whose life is the principal subject of this communication, was born in Salem, on the 22d of February, 1779. He received his academical education here in town, studying Latin in the school of Mr. John Watson, mathematics with St. John Honeywood, and completing his preparation for college in the academy when it first commenced under Preceptor Ingalls. He was in the third class which was graduated at Union College, in 1799, on which occasion he had the first honor, the Latin salutatory oration, assigned him. He studied law in the office of Judge Woodworth in Troy, and in 1803 was admitted as an attorney, and three years later as a counsellor in the Supreme Court, Martin Van Buren being on both of these occasions examined in the same class with him.

In 1803 he opened a law office in Salem, in partnership (continued only a year and a half) with John Russel, Anthony I. Blanchard being the only other lawyer in town at the time. His first important exercise of the elective franchise was in the presidential contest of 1804, when he voted for the legislature which cast the vote of this state in favor of Thomas Jefferson; and he was appointed the messenger to convey this vote to Washington, where he delivered it to Aaron Burr, then Vice President; and on this occasion he was introduced to Mr. Jefferson, Mr. Gallatin, Mr. Granger the Post Master General, and other noted men in Washington.

In 1806 he entered into a partnership, which continued five years, with the late Hon. John Crary. He was this year elected supervisor of the town, and also received from the council of appointment the office of district attorney for the northern district of the state, which at that period was divided into the four counties of Washington, Essex, Clinton and St. Lawrence.

In 1810 he married Esther, daughter of Gen. Timothy Newel of Sturbridge, Mass. who died the following March, and in the succeeding autumn he was himself prostrated by typhus fever, which nearly carried him to his grave, and left him so feeble and predisposed to consumption that, upon the concurring advice of the Doctors Allen, he gave up his professional business, intending to take a sea voyage, and pass the winter in the West Indies. Gerrit Wendell, however, being counsel for a gentleman who had an estate in Ireland which he was anxious to have sold and closed up, persuaded him to go thither,

with this business in his charge. Passing through Albany on his way, he handed in to Gov. Tompkins his resignation of the office of district attorney. 'Who would you like to have appointed your successor?' asked the governor. 'Roger Skinner of Sandy Hill would be a very good appointment,' Judge Savage replied, although he had never consulted with him upon the subject. Mr. Skinner was thereupon appointed, and repaid Judge Savage ten-fold for this compliment in after years.

He landed in Ireland in December, 1811, and accomplished the business which had been confided to him. He had intended after this to make a tour through England and Scotland, but the prospect of a war between this country and Great Britain had become so threatening that it caused him to forego this purpose and hasten back home. He took passage upon a vessel which was loaded with Irish emigrants. Impressment of British subjects from vessels on the high seas was a daily occurrence at this time, and midway of the ocean they were overhauled by a British cruiser. But the captain's courtesies to the officers so conciliated their favor that they merely went through with the formalities of an examination, without impressing any of the emigrants, although several of them were fine, robust young men. On the 12th of June, 1812, they came in sight of Montauk Point and ran into Long Island Sound. On reaching New York they learned that a British man of war, informed of their being on the ocean, was lying off Sandy Hook purposely to intercept them and send them back to England.

To re-establish his health he now for several years devoted a portion of his time to agricultural pursuits, assisting his father with his farming operations. Upon the solicitation of David Woods he entered into a law partnership with him; and Mr. Skinner, on hearing of his return, immediately resigned the office of district attorney and procured his reappointment, though a change in political parties caused his removal soon after.

In 1813 he was elected a member of the legislature. The country was now engaged in the war with Great Britian, and political strife raged with unusual violence. Judge Savage regarded the war as being necessary and just, and felt that the government of the country ought therefore to be sustained in its vigorous prosecution. He accordingly gave his support to the administration of President Madison and approved the course of Gov. Tompkins. His party was in the minority in the state legislature, and it is an evidence of the estimation in which he was held, that at the close of the session he was

selected to draw up the minority report, vindicating their principles and conduct, which document he prepared with marked ability.

He next served two terms in congress, being elected a representative in 1814 and again in 1816. In November of this latter year he married his second wife, Ruth, daughter of Gideon Wheeler, Esq. of Lanesborough, Mass. and he now sought to withdraw himself from political life and devote himself to the practice of his profession. He accordingly declined another nomination to congress, and entered into a law partnership with Philo Curtis. In 1818 the district attorney was made a county officer, to be appointed by the board of supervisors. Jesse L. Billings, the occupant of this office at that time, having spoken contemptuously of this change, caused the supervisors to drop him and reappoint Judge Savage, although they were both of the same political party.

He now regarded himself as probably settled to pass the remainder of his life in the practice of law in the village of Salem. As he was sitting one day in his office, in February, 1821, Sheriff Gibbs called in upon his way home from Albany. The judge inquired what was the news in Albany. 'The main item of news,' said Gibbs, 'is that John Savage, of Salem, has been appointed comptroller of the state of New York.' Savage was thunderstruck, and could scarcely credit his friend's statement. Archibald McIntyre had held this office for the previous fifteen years, serving in it most acceptably and faithfully; but Gov. Tompkins being a public defaulter, McIntyre had taken an active part in exposing his defalcation and defeating his re-election. A majority of the council of appointment, however, were Tompkins' political friends. Roger Skinner being one of the number, brought forward a motion for Mr. McIntyre's removal. 'For what reason?' sternly asked Gov. Clinton, the presiding officer of the council. Of course no valid reason could be given, and Skinner merely replied, 'I think the public good requires it.' On putting the motion to vote, it was carried. Skinner then nominated Judge Savage for the office, and he was elected.

Savage thought his friend Skinner had done a rash thing in taking this step. He distrusted his ability to perform the duties of this important office, they were so unlike those of any position in which he had previously been placed. He hastened immediately to Albany and sought an interview with McIntyre. Instead of the gruff reception which he had anticipated, he was met with the utmost cordiality and kindness, Mr. McIntyre pleasantly remarking, it was the fortune of politics which had removed him, and he cheerfully submitted

thereto. Upon Judge Savage's adverting to the great amount and complex nature of the business of the office, his own inexperience in business of this kind, and his fears that he should be embarrassed at every step and wholly unable to suitably perform the duties of the station, Mr. McIntyre assured him that if he only retained in their places the old deputy and clerks, who were familiar with the affairs of the office in all their details, he would experience no difficulty whatever.

His resolution was thereupon formed. Although he was beset with applications for appointments by the dozen, and his political friends advised him to make a clean sweep of the office, he firmly refused, and retained all the former clerks in their places. He moved from Salem to Albany, and summoning to his assistance the deputy and head clerks, applied himself most assiduously to a study of the business of the office and soon became perfectly master of it. The thorough acquaintance which he thereupon showed with all the affairs of the comptroller's department added greatly to his popularity.

We have not space in this brief sketch to particularize the different public measures which he originated, or in which he prominently participated. Suffice it to observe that the system of taxing corporations originated with him. It had previously been the practice to assess the individual stockholders the amount of their interest, in connection with their other property. But many of the stockholders were nonresidents of the state, and of others their interests were unknown. Hereby a large amount of money which was profitably invested within the state escaped from contributing any thing towards sustaining the public burthens. An elaborate report on this subject, from Comptroller Savage, led to the adoption of the new system, which has since continued to be the established policy of the state.

The office of chief justice now came to him, almost as unexpectedly as that of comptroller had done. By the new constitution, adopted in 1822, a reorganization of the judiciary of the state became necessary. The democratic party was at this time in the ascendancy. Of the old judges of the supreme court, Spencer, Platt and Woodworth, the two first had rendered themselves obnoxious to the party by the course they had taken in the convention for revising the constitution, and Gov. Yates was besought to nominate in their stead Messrs. Van Buren, Young and Talcott. But the governor had too high a respect for his old associates upon the bench to thus turn them adrift, and accordingly nominated them for reappointment. They were all rejected by the senate. This vexed the governor, and he was a man

APPENDIX.

of too much spirit to be dictated so entirely by party. Affairs being
in this posture, one of the governor's friends who was desirous of a
seat upon the bench, induced him to nominate Comptroller Savage
for chief justice and Sutherland and himself for associates. The sen-
ate on the 29th of January, 1823, elected the two first and rejected
the third, regarding him as having been the active instrument in
keeping the favorite candidates of the party in the background.
Upon the suggestion of Judge Savage, the name of his old instructor
in law, Judge Woodworth, was then sent into the senate a second
time by the governor, and he was thereupon elected.

It was in this office of chief justice of the supreme court of the state
that Judge Savage acquired the greatest distinction of his life.

  *   *   *   *   *   *   *

He held the office of chief justice until August, 1836, when he was
induced to resign it in consequence of the illness of his wife, which he
regarded as demanding his personal care, and which soon after resulted
in her death. In 1837 he moved from Albany to Utica, where a
short term of service as clerk of the supreme court, to which he was
appointed by the judges of the court in which he had so long pre-
sided, was the only public service in which he was afterwards
engaged. In 1840 he came back to Salem, and occupied himself in
repairing the family homestead and premises, moving his family here
in 1842. He regarded with favor every public measure which tended
to the advancement of good morals and the improvement of society.
A decided friend of the temperance cause, from its commencement, he
was a prominent officer in the state society, and after his return here in
our county organizations, for promoting this reform, and of the addresses
which he delivered when occupying these positions two at least were
published. Upon returning again to the agricultural pursuits of his
early years, he took a lively interest in our county agricultural society,
officiating as its president and delivering the address at its second
annual fair. In the canvass of 1844 he was one of the presidential
electors, and president of the electoral college which cast the vote of
the state in favor of James K. Polk. And in this connection the
record merits to be preserved, of the exercise of the elective franchise
made by one so profoundly versed in the laws and polity of our
country as was Judge Savage, and to whose heart its welfare and the
perpetuity of its government was so dear. As has already been
stated, at the outset of his political life, in 1804, he cast his vote in
favor of Thomas Jefferson. In 1808 he voted for Mr. Madison, and
again in 1812. In 1816 he voted for Mr. Monroe, and again in 1820.

In 1824 he voted for Mr. Crawford, and in 1828 for Gen. Jackson, as he did again in 1832. In 1836 he voted for Mr. Van Buren as he did again in 1840, and in 1844 for Mr. Polk. In 1848 he voted again for Mr. Van Buren; in 1852 for Gen. Pierce; in 1856 for Gen. Fremont; in 1860 for Abraham Lincoln; and for governor in 1862 he voted for Gen. Wadsworth.

For a time after his return to Salem he was accustomed to go south to pass the winter season, deeming himself so predisposed to pulmonary disease that he was illy able to endure the rigors of our northern climate. He thus passed two winters in St. Augustine, one in New Orleans, one in Washington and one in the city of New York. He then ventured to remain at home through one winter, and as the result of this ample experience he became convinced that a southern residence during the inclement period of the year gave him no more immunity from protracted colds and coughs than he enjoyed here at the north.

Having no male heir to succeed him in the cultivation of his paternal acres, and conscious that in the infirmities of advanced life a city residence would furnish him and his family with more of the comforts and conveniences of life than they could have in an isolated rural abode, he in 1853 disposed of the farm which had been occupied by his family nearly a century, and returned to Utica, where he passed his remaining years in the tranquillity of domestic life, and died on the 19th of October last, aged 84 years.

# INDEX.

## A

### ACTION.

1. The maker of a promissory note has the whole of the last day of grace within which to pay it; and though he should in the course of the day refuse payment, which will entitle the holder to protest it and give notice to the indorsers, yet if he subsequently, on the same day, makes payment, it is good, and the notice of dishonor becomes of no avail. Hence an action commenced on the third day of grace, though after protest, will be prematurely brought. *Oothout* v. *Ballard,* 33

2. In respect to the time for commencing a suit, there is no distinction between a note payable at a bank, and one payable at large, or at the counting house of the maker. *ib*

3. The right of every one to use his own property as he pleases, for all the purposes to which such property is usually applied, is unlimited and unqualified, up to the point where the particular use becomes a nuisance. *Fisher* v. *Clark,* 329

4. Simply turning one's own sheep, having an infectious disease, into his own lot, adjoining the lot of another occupied by sheep, is not unlawful, nor such an act of wrong or negligence as will give to the owner of the adjoining lot a legal cause of action, for damage sustained in consequence of the disease being communicated to his sheep. *ib*

*See* COMPTROLLER'S SALE.
EXECUTORS AND ADMINISTRATORS, 2, 3, 4.
SLANDER OF TITLE.

### ACTS OF CONGRESS.

*See* CONSTITUTIONAL LAW, 1, 2.

### ADJOINING OWNERS.

*See* FENCES.

### ADULTERY.

*See* DIVORCE, 1 to 5.

### ADVERSE POSSESSION.

1. The 85th section of the code, which enacts that for the purpose of constituting an adverse possession, by a person claiming title not founded upon a written instrument, or a judgment or decree, land shall be deemed to have been possessed and occupied in the following cases only: 1. Where it has been protected by a substantial inclosure; 2. Where it has been cultivated or improved, was intended to provide that a party claiming to hold adversely should protect his claim by the erection of a substantial inclosure, and the language employed

means that he shall erect an inclosure around the land, without relying upon a remote fence of a neighbor, inclosing that neighbor's land also. *Doolittle* v. *Tice*,            181

2. Although the claimant may avail himself of a fence upon the line, yet it was not designed that a fence located far away from the premises, and including other lands, should be used as a means of protection to a claim of this character.       *ib*

3. It was also intended that the inclosure should provide fixed, certain and definite boundaries of the claim made, by which it might be designated, marked and known.   *ib*

4. It must be an inclosure of the lot alone, upon the lines claimed by the party, and not embracing premises adjoining, extending, in part, a great distance from the lines.     *ib*

5. To constitute a compliance with the 2d clause of the section the land must not only be *cultivated* but *improved*.                              *ib*

6. Reaping alone cannot be considered cultivating. Nor can the keeping up of a fence already made, mowing the grass, and cutting brush, be deemed an improvement, within the meaning of the statute.                                     *ib*

7. The statute was intended to provide for the ordinary cultivation and improvement of lands in the manner in which they are usually occupied, used and enjoyed by farmers, for agricultural purposes, by sowing, plowing and manuring, and by the erection of buildings, &c. which may add to their value. *Per* Miller, J.   *ib*

8. The possession which will avoid a deed for champerty must be under claim of a title adverse to that of the grantor, in the deed sought to be avoided. A *cestui que trust* cannot claim to hold adversely under his own trustee. *Newton* v. *McLean*, 285

## AGREEMENT.

1. An agreement by an insurance company to allow the maker of a note given for premiums, in advance, five per cent on the whole amount of the note, without deduc-

tion for such sums as may be written against, is illegal, and the note cannot be recovered on, by the company. *Chesbrough* v. *Wright*,      28

2. Where A. buys and pays for stock at B.'s request, on joint account, under agreement that B. shall pay him for the moneys advanced, A. holding the stock, in the mean time as a pledge for repayment, with a right to expose it for sale in the market, if upon notice B. refuses to pay for it, the agreement, though by parol, is not void by the statute of frauds. *Stover* v. *Flack*,      162

3. By a written contract between the parties, for the purchase by the defendants of a quantity of first sort hops, from the plaintiff, the hops were to be inspected and branded by S. and delivered in New York on or before the 20th of November, 1860, and paid for by draft on the defendants, at thirty days, &c. The hops were in fact inspected by S. and pronounced by him to be of the first sort, but were not branded as such by him. On the plaintiff's agent offering to telegraph to S. for permission to put his brand on the bales, one of the defendants said that they (the defendants) would not require it, or that it would make no difference. *Held* that the referee was right in holding as matter of law, that the defendants were estopped from insisting upon the omission to brand the hops, as a defense to an action for the price. *Clinton* v. *Brown*,      226

4. *Held*, also, that the written contract having made the inspection and determination of S. conclusive upon the parties, as to the quality or grade of the hops, the defendants could not be allowed to show, in such action, that the hops, when inspected by him, were of a quality inferior to that specified in the agreement.                              *ib*

5. Parties residing and doing business in the city of New York, there indorsed and procured to be discounted, a promissory note payable in Alabama. *Held* that the indorsement was a New York contract, and governed by the laws of New York. *The Artisans' Bank* v. *The Park Bank*,      599.

6. By such an indorsement, the indorsers promise to pay the note in New York if, upon its being presented for payment in Alabama, payment is refused and they are duly notified of such demand of payment and refusal. *ib*

7. Where a tenant agreed by parol, with his lessor, that he would turn out hay and grain to secure the payment of the rent reserved in the lease, if the lessor was afraid that she would not get her pay; the value of the property being over fifty dollars, and nothing being paid, and no receipt or credit actually given, or possession delivered; *Held* that the transaction rested in words merely, and no title passed. *Buskirk* v. *Cleveland*, 610

8. Although an oral agreement to exchange one piece of real estate for another is void by the statute of frauds, yet if the parties have executed such an agreement, in part, and the plaintiff has fully performed to the extent of his agreement, and the defendant has accepted and retained all the advantages to be derived from such performance, it will not, after that, lie with him to refuse performance on his part and urge the invalidity of the agreement. *Bennet* v. *Abrams*, 619

9. To permit a party to avoid the agreement, under such circumstances, on the ground of its invalidity, would be to make the statute of frauds an instrument of fraud, instead of a shield against it. *ib*

10. Where possession has been taken by both parties under an oral agreement for the exchange of land, and one of them has fully performed on his part, and the fairness of the agreement is not assailed, he may maintain a suit in equity to enforce a specific performance of it by the other party. *ib*

11. An executory contract for the exchange of lands is not merged in the deeds of conveyance. And if one of the parties to such a contract agrees to satisfy and discharge an existing mortgage upon his land, in addition to the execution and delivery of a deed, these are separate and distinct acts, and performance as to one will neither extinguish nor discharge the party's obligation in respect to the other. *ib*

12. A stipulation or agreement entered into by the counsel for the respective parties on the trial of a cause, and in the face of the court, relative to the conduct of the suit and the proceedings therein, and entered in the minutes, is binding and conclusive upon the parties. *Staples* v. *Parker*, 648

13. The rule which requires all agreements between parties and their attorneys, in respect to the proceedings in a cause, to be in writing, has no application to that class of stipulations. *ib*

14. By a written agreement under seal between the plaintiff and defendant, the former agreed to sell and convey to the latter a farm of 400 acres, and to transfer to him certain personal property thereon, consisting of a great number of articles; which sale and transfer were not necessarily to be simultaneous acts. And the defendant agreed to pay and secure to the plaintiff the sum of $7500 as the price or consideration of such sale and transfer. The parties then bound themselves, their heirs &c., in the sum of $1000, that in case either party should, in any way, fail to fulfill or perform the contract, or any part or portion of it, then the party in default should pay unto the other the said sum, "the same being agreed upon by the said parties as actual and assessed damages, and the same to be paid without suit or litigation." *Held* that the sum named was intended by the parties as a *penalty* and not as *fixed and liquidated damages*. *ib*

*See* LIMITATIONS, STATUTE OF, 6, 7, 12, 13.
PARTICEPS CRIMINIS.
PARTNERSHIP, 8.
SLANDER OF TITLE, 2.
TELEGRAPH.

## AMENDMENT.

1. In exercising the power of allowing amendments " in furtherance of justice," no discrimination should be made, by the courts, between legal defenses offered to be set up, on ac-

count of their character. All defenses recognized by statute as being such—including those styled unconscionable, such as the statute of limitations, usury &c.—stand upon an equal footing in this respect. *Sheldon* v. *Adams*, 54

2. A party has a vested right to set up those defenses as well as . any other, when they have become perfect. *ib*

3. Where promissory notes, given to an insurance company, have been sued upon as premium notes assessed, the complaint will not be allowed to be amended—after the notes have become outlawed, as stock notes—by inserting therein an additional claim and count upon them for the whole amount thereof, as stock notes given before the organization of the company and as constituting a part of its capital ; the effect of which amendment would be to cut off the defense of the statute of limitations. , *ib*

4. Nor will an amendment be granted by which a note liable to be assessed only for losses in one class of hazards, is permitted to be sued on as a stock note, and made liable for all losses. *ib*

5. An amendment of the complaint, not moved for until after eight years have elapsed since issue joined, nor until after the death of the original plaintiff, and the defendant's attorney, should not be granted, without sufficient excuse being shown. *ib*

See FRAUDULENT REPRESENTATIONS. PARTIES, 4.

### APPEAL.

1. An order of a special term allowing a complaint to be amended by inserting therein an entirely new and different cause of action, which will require a different defense, involves the merits, and affects a substantial right, and is therefore appealable. *Sheldon* v. *Adams*, 54

2. An undertaking given on appeal to the general term on demurrer, was conditioned that the appellants would pay all costs and damages which might be awarded against them on said appeal, not exceeding $250, and also the judgment appealed from, *if the same should be affirmed*. *Held*, that there was no liability on the part of the sureties, until there was an absolute affirmance of the judgment. *Poppenhusen* v. *Seeley*, 450

3. The respondent must have the right to enter and collect a *judgment of affirmance*, before he can proceed against the sureties in such an undertaking. SUTHERLAND, J. dissented. *ib*

4. A mere order of the general term, affirming the judgment appealed from, except that the appellants have leave to answer the complaint, is not sufficient to authorize a recovery upon the undertaking. *ib*

*From Commissioners of Highways.* See HIGHWAYS. .

### ARREST.

*See* CONSTITUTIONAL LAW.

### ASSESSMENT.

*See* INSURANCE (FIRE,) 1, 2, 3, 4, 6.

### ASSIGNMENT.

*In trust for the benefit of Creditors.* See DEBTOR AND CREDITOR.

*In Bankruptcy, or Insolvent Proceedings.* See ATTACHMENT.

### ATTACHMENT.

1. It is now the settled law of this state that a prior assignment in bankruptcy, or under insolvent proceedings, in a foreign nation, or in another state of this union, will not be permitted to prevail against a subsequent attachment of the bankrupt's or insolvent's effects by a creditor residing here. *Kelly* v. *Crapo*, 603

2. Such an assignment will be regarded by the courts of this state as operating to transfer all the property of the bankrupt or insolvent

situated, at the time of the assignment, within the territory, or being under the dominion, of the nation or state where the proceedings were instituted. *ib*

3. But such an assignment will not transfer to assignees appointed in insolvent proceedings instituted in another state of this union, the title to a vessel registered there, and on the high seas, at the time, as against a subsequent attachment sued out by a creditor residing here. SUTHERLAND, J. dissented. *ib*

4. That comity which should exist and be liberally practised between all civilized nations, and more especially between sister states, forbids that our courts should go any further than they have already gone, in giving a preference to the claims of creditors of the bankrupt or insolvent, who are citizens of this state, in respect to property actually here. *ib*

5. The preference should not be extended in respect to property not within our jurisdiction at the time of the assignment, merely because it was not actually within the territorial limits of the other state, although virtually under the dominion of her laws as property. *ib*

*See* EXECUTORS AND ADMINISTRATORS.
INTERPLEADER.
PRACTICE, 1.
SHERIFF, 1, 2, 5.

### ATTORNEY.

*See* PARTICEPS CRIMINIS, 6.

## B

### BANKRUPTCY.

*See* ATTACHMENT.

### BANKS.

1. The fact that an individual is a member of the board of directors, and of the discount board, of a bank, will not, in the absence of any special authority to act as the agent of the

corporation, in a particular transaction respecting the discounting or renewal of a note, authorize him to make admissions or statements concerning such transaction, which will bind the bank. SUTHERLAND, J. dissented. *The East River Bank* v. *Hoyt*, 441

2. In the absence of any proof that the charter of a bank contains any restriction or limitation on the power of the bank to negotiate or indorse notes or bills of exchange, or on the authority of its cashier to indorse such negotiable paper for the bank, the presumption is that the bank has power, and its cashier authority, to indorse paper of that description. *Robb* v. *The Ross County Bank*, 586

3. Though it appears that a bill was indorsed by the cashier of a bank for the mere purpose of collection, or for some other special or limited purpose, such proof will not prejudice or affect the right of a *bona fide* holder for value, before maturity, to recover thereon against the bank; unless it be proved that he took the bill with notice of such special purpose, or under circumstances requiring him to make inquiry as to the purpose of the indorsement. *Per* SUTHERLAND, J. *ib*

4. Even though the bank had never owned the bill, or had any interest in it, that circumstance will not affect the right of an innocent holder for a valuable consideration, before maturity, to recover against the bank as indorser. *Per* SUTHERLAND, J. *ib*

5. The omission of a cashier, on indorsing a bill of exchange, to write, before or after his name and the name of his office, the words " for the ———— bank," will not preclude the holder from recovering against the bank as indorser. An indorsement as follows: " B. P. K.,, cash'r," will bind the bank of which B. P. K. is cashier. *ib*

6. A proceeding under the act of 1849, " to enforce the responsibilities of stockholders," &c. (*Laws of* 1849, *p.* 343,) is not barred by a previous judgment recovered in an action instituted under the revised

statutes, (2 *R. S.* 463, §§ 39, 40,) by a stockholder of the bank to compel the application of its assets to the payment of its debts. *Diven* v. *Duncan*,        520

7. In a proceeding under the act of 1849 to enforce the individual liability of the stockholders of an insolvent bank, for the payment of its debts remaining after its assets are exhausted, executors are properly chargeable as holders of stock which appears on the books of the bank to have been held originally by their testator, and subsequently by them.      *ib*

8. If a stockholder is living, and a resident of the county in which the notice to stockholders is published, at the time the publication commences, his death afterwards,will not abate the proceedings, or render the publication ineffectual.    *ib*

*See* PROMISSORY NOTES, 4, 5.

### BILLS OF EXCHANGE.

*See* BANKS.

### BILL OF SALE.

*See* EVIDENCE, 4, 5, 6, 8.

### BONA FIDE PURCHASER.

*See* PARTNERSHIP, 5, 6.

### BOND.

Bonds, issued by a rail road company, whether under its corporate seal or not, payable to A. B., or the holder thereof, are negotiable, and will pass by delivery. *The Connecticut Mutual Life Ins. Co.* v. *The Cleveland, Columbus &c. Rail Road Co.*    9

*See* INTEREST.

### C

### CASES DOUBTED, OVERRULED COMMENTED ON, &c.

1. The case of *The Bank of the State of New York* v. *The Farmers' Branch of the State Bank of Ohio* (26 *Barb.* 332) overruled. *Robb* v. *The Ross County Bank*,       586

2. The case of *Lee* v. *Selleck*, (22 *Barb.* 522,) commented on and explained. *The Artisans' Bank* v. *The Park Bank*,     599

3. The case of *Moyer* v. *Hinman*, (17 *Barb.* 139,) which holds that a judgment regularly docketed against the vendor of lands by an executory contract is a charge upon the land and binds the legal title, is not well supported by authority. (*See S. C.* 13 *N. Y. Rep.* 180.) *Per* POTTER, J. *Smith* v. *Gage*,      60

4. Dictum of Spencer, Ch. J. in *Wheaton* v. *Hibbard*, (20 *John.* 290,) overruled. *Porter* v. *Mount*,    561

### CHAMPERTY.

*See* ADVERSE POSSESSION, 8.

### CHATTEL MORTGAGE.

1. At law a mortgage or sale of future acquired personal property, the mortgagor neither having acquired the thing nor the agent of its production, at the time of making the contract, creates no valid subsisting property. But if the future acquired property be the product of present property in the mortgagor, as the wool growing on a flock of sheep, or the produce of a dairy, or a farm, or any thing of that character, the mortgage will take effect upon the property as soon as it comes into existence, and will be perfectly binding at law. *Conderman* v. *Smith*,      404

2. Where one purchases property covered by a chattel mortgage within a year after the mortgage is made and filed, the property will continue subject to the lien of the mortgage so long as the purchaser continues the owner, even though the year has expired without filing in the town clerk's office of a copy of the mortgage with a statement of the interest of the mortgagee in the property. *Wiles* v. *Clapp*,     645

3. One deriving title to mortgaged property from a purchaser who be-

within the year will stand in the same position as his vendor. *ib*

4. But if he merely takes the property for an antecedent debt, without paying or advancing any thing at the time, or giving up any security, he will not be regarded as a *bona fide* purchaser, or purchaser in good faith. *ib*

5. The re-filing of a chattel mortgage in the town where the mortgagor resides is only necessary to secure the lien against creditors of the mortgagor, and purchasers and mortgagees in good faith. *ib*

## COLLISION.

*See* RAIL ROAD COMPANIES, 5, 6, 7.

## COMMISSIONERS OF LOANS.

*See* PARTIES.

## COMPLAINT.

1. In an action to recover back money paid on compulsion, or by duress of goods, the complaint should state the facts, and not a mere conclusion of law. The court must be able to see, from the facts stated, that the payment was in fact compulsory and compelled by duress of the party's goods. *Commercial Bank of Rochester* v. *The City of Rochester*, 341

2. It is not sufficient simply to allege, in a general way, that the payment was compulsory, and not voluntary. *ib*

3. It need not be stated, in a complaint, that the plaintiff has a legal capacity to sue. The want of such an allegation affords no ground of demurrer. *Per* LEONARD, P. J. *The Phenix Bank of the City of New York* v. *Donnell*, 571

*See* CORPORATIONS, 7, 8.

## COMPTROLLER'S DEED.

*See* RELATION.

## COMPTROLLER'S SALE.

1. If all the steps are legally taken, in assessing taxes and returning

them as unpaid, that are required, to give the comptroller power to advertise the land for sale, the omission of the town clerk, at town meeting, to give notice, according to the statute (1 *R. S.* 931, § 76, *5th ed.*) that lists of the land advertised for sale by the comptroller, for unpaid taxes, have been deposited in his office, will not render all the other proceedings nugatory, and make void a title obtained under the sale. *Pierce* v. *Hall,* 142

2. One whose right to wild and uncultivated land purchased at a comptroller's sale for taxes has become absolute; who is entitled to a deed from the comptroller; and who has all the actual possession that it is usual to take of that species of lands, may, *it seems,* maintain an action against a stranger for carrying away logs therefrom. He may at least, by virtue of such possession, defend his title to the logs, or defeat an action brought against him by the trespasser, for their value. *ib*

## CONSTABLE.

*See* JUSTICES' COURTS, 9, 13, 14.

## CONSTITUTIONAL LAW.

1. The constitution of the United States extends the judicial power of the union to all cases in law and equity arising under the constitution, laws and treaties of the United States. And it has been decided that a case arises, within the meaning of this provision, as well when the defendant seeks protection under a law of congress, as when a plaintiff comes into court to demand some right conferred by law. *Jones* v. *Seward,* 269

2. Accordingly *held* that congress having, by the act of March 3, 1863, relating to *habeas corpus*, &c., provided that on suits being brought for any arrest, imprisonment &c. made " by virtue or under color of any authority derived from, or exercised by or under the president of the United States, or any act of congress," the defendant may remove such action into the circuit court of the United States, the court

in which the action is brought has nothing to do with the validity of the act of congress, as a defense to the suit. It is sufficient that the defense involves the construction and effect of a law of congress. CLERKE, J. dissented. *ib*

3. If the defendant, in an action for false imprisonment, sets up as a defense the orders &c. of the president, the question for the court is not as to the constitutionality of the fourth section of the act of congress, declaring that the order or authority of the president shall be a defense, in all courts, to any action for an arrest &c. made under or by color of the president's order, or any law of congress; but is as to the constitutionality of the fifth section of the act, authorizing the defendant to remove the action from the state court to the circuit court of the United States. *Per* SUTHER-LAND, J. *ib*

4. And upon an appeal from an order denying a motion to remove the cause to the circuit court of the United States, the question is not as to the constitutional power of the president to order the arrest, imprisonment &c. or as to the constitutional power of congress to authorize the president to order the arrest, imprisonment &c. complained of; but it is as to the constitutional power of congress to give the circuit courts of the United States original and exclusive jurisdiction of the trial of actions for such arrests, imprisonments, &c. *ib*

5. In cases coming within the fifth section of the act of March 3, 1863, no application to the state court is necessary in order to give to the circuit court of the United States possession of the action; but if such application is made and denied, the general term may, on appeal, direct an order to be entered transferring the cause to the circuit court of the United States. *ib*

CORPORATIONS.

1. Any improper condition imposed by one of the projectors of a company, before its organization, in respect to a loan to be made by it, will not invalidate the transaction consummated after the company is organized; unless the company has adopted and ratified the act of its agent. *The Central Park Fire Ins. Co.* v. *Callaghan*, 448

2. On the 15th of September, 1855, a manufacturing corporation, by resolution, appointed K. its general agent and attorney, agreeing to pay him a salary of $1000 a year, to commence on the first day of that month, besides expenses; but no time was fixed when the salary was to become due and payable. *Held* that the company did not contract a *debt* within the meaning of section 12 of the act of February 17, 1848, authorizing the formation of corporations for manufacturing and other purposes, for the salary of K. when they adopted that resolution. Nor did they contract a debt for his services from day to day, or month to month, as they were rendered; the statute speaking of "debts" existing or contracted, not of *liabilities* which may ultimately ripen into debts. *Oviatt* v. *Hughes*, 541

3. That K. was to be paid a price agreed upon, *by the year*, for his services; and there being no express stipulation as to the time when he was to be paid, he was not entitled to pay, by the terms of the resolution, until the expiration of a year from the time when the salary was to commence. But that the time of payment might be changed by a subsequent agreement terminating the employment and allowing K. compensation at the rate of $1000 a year, for the time already elapsed. *ib*

4. *Held, also*, that the expenses of K., incidental to the business, were put upon the same footing as his salary, in respect to the time when they could be considered a debt against the company. And that upon the failure of the trustees to make the report required by the 12th section of the act of February, 1848, the corporation was to be deemed indebted to K. only for such expenses as he had paid or incurred up to that time. *ib*

5. A statute of another state, under which the plaintiffs claimed to have been incorporated, declared that persons associating under articles of

agreement according to the statute, and who should *comply with all the provisions* thereof, should constitute a body politic and corporate. It then provided that before any corporation so formed should commence business, the officers should cause the articles to be published in two newspapers, &c. *Held*, that a corporation might be such for all the purposes of bringing an action, without publication. SUTHERLAND, J. dissented. *Holmes* v. *Gilliland*, 568

6. *Held, also*, that general reputation that the plaintiffs were conducting business as a corporation, coupled with the fact that the note sued on was payable to them, was sufficient evidence of the existence of the corporation to prevent a dismissal of the complaint, for want of proof of publication of the articles. *ib*

7. A corporation suing as such, need not allege in the complaint, that it is a corporation duly incorporated and has legal capacity to sue. *The Phenix Bank of the City of New York* v. *Donnell*, 571

8. Where a plaintiff sues by an appropriate corporate name, it is not necessary to expressly aver in the complaint that the plaintiff is a corporation; there being in such a case an implied averment in the complaint that the plaintiff is a corporation. *Aliter* in a suit by a corporation incorporated by the name of an individual. *Per* SUTHERLAND, J. *ib*

*See* JURISDICTION.
PRINCIPAL AND AGENT, 4, 5, 6.

## COUNTER-CLAIM

1. The defense of usury is not a counter-claim within the meaning of the code. *Prouty* v. *Eaton*, 409

2. Matter which shows that the plaintiff never had any cause of action, against the defendant, which the law would aid him in enforcing, is no counter-claim. *Per* JOHNSON, J. *ib*

## COUNTY COURT.

*See* SPECIFIC PERFORMANCE, 4.

# D

## DEBTOR AND CREDITOR.

1. It being the duty of an assignee under an assignment to him in trust for the benefit of creditors, to take care of and protect the assigned property, he may maintain an action of trespass against any person who interferes therewith. *McQueen* v. *Babcock*, 337

2. The bringing of such an action by the assignee, against one who assumes to take the assigned property out of his possession, is in furtherance of his duty, and hence is not an intermeddling with the property improperly, or within the sense and meaning of an injunction order prohibiting him from "intermeddling with, receiving or collecting" any of the property of the assignor. *ib*

3. Such an injunction is no bar to a suit against a sheriff, for taking the assigned property out of the hands of the assignee; and if suit is not brought within three years, the statute of limitations will be a good defense. *ib*

## DIVORCE.

1. Proof of adultery, alone, is not sufficient to authorize a judgment of divorce. It must be averred in the complaint that the adultery charged was committed without the consent, connivance, *privity* or procurement of the plaintiff; and the complaint must be verified by the oath of the plaintiff. *Myers* v. *Myers*, 114

2. Where a plaintiff, in his complaint, alleged that five years had not elapsed "since he discovered the fact that such adultery had been committed by the defendant without his consent, connivance or procurement;" *Held* that this averment was not a compliance with the above rule. *ib*

3. Upon a reference, in an action for a divorce, it is the duty of the referee to find not only as to the fact of adultery, but also as to all other material facts, such as connivance of the plaintiff, &c. *ib*

4. No one has a right to relief from a court for an injury which he was himself chiefly instrumental in effecting. Upon this principle, connivance by a plaintiff at the adultery of the defendant, destroys all claim to remedy by way of divorce, though the adultery be proved. *ib*

5. Circumstances considered as amounting to proof of the plaintiff's consent to, privity with, or connivance at, the adultery of the defendant. *ib*

6. The court will order any judgment for divorce, obtained by collusion or fraud, to be set aside, not from any regard to the parties concerned, but from motives of public policy. *Singer* v. *Singer*, 139

7. In such a case, however, it should be made apparent that the party moving is acting from good motives, and not from any expected personal advantage. *ib*

8. Where judgment for divorce has been acquiesced in for the period of several years and the plaintiff has again been married, some better reason than the mere gratification of personal feeling on the part of the defendant, or the desire to obtain a further sum of money from the plaintiff, should be made clearly to appear, before the court would be warranted in granting such an application. *ib*

9. No ground of policy should suffice where the parties have acquiesced in the judgment for three years, and a third person has acquired rights by marriage. *ib*

# E

## ELECTION.

*See* OFFICE AND OFFICER.

## EMPLOYER AND EMPLOYEE.

1. An employer is responsible in damages to an employee, for an injury resulting from the employer's negligence. *Connolly* v. *Poillon*, 366

2. The employee himself is bound to exercise all reasonable care and prudence, and if any injury results through his want of care, or through his own negligence combined with that of the employer, he has no right of action against the latter. *ib*

3. It is the duty of an employer to exercise care and prudence that persons in his employ be not exposed to unreasonable risks and dangers, and the employee has a right to understand that the employer will exercise that diligence in protecting him from injury. *ib*

4. Thus where the plaintiff, who was not a ship carpenter or joiner, or a mechanic of any kind, and knew nothing about the construction of scaffolding, or the forces it would be required to resist, was put into the hold of a gunboat, by his employer, a ship-builder, to remove the chips and rubbish underneath a scaffold; *Held* that he had a right to rely upon the superior knowledge of his employer, and upon his care and prudence that the scaffold was of sufficient strength to insure him against all harm. *ib*

5. *Held also*, that even though the plaintiff himself, in pursuance of his employer's orders, assisted in piling planks upon the scaffold, which fell, from the weight so placed upon it, whereby the plaintiff was injured, he was not chargeable with negligence contributing to the injury, so as to defeat a recovery against the employer. *ib*

## EQUITY.

1. A release of the lien of a mortgage, though void at law if not under seal, may be enforced in equity. *Headley* v. *Goundry*, 279

2. A court of equity can give effect to parol contracts; and a release not under seal is equivalent to a parol agreement for a release of the premises described in it. *ib*

3. Relief is given in such cases, and imperfect contracts made effectual, where the party seeking such relief is clearly entitled to the intervention of the court; upon the

principle that what is agreed to be done is considered in equity as done when it ought to be done. *ib*

4. But where G. proposed to H. and S., to whom he and his wife had executed a mortgage that if they would release the mortgaged premises from the lien of the mortgage, he would make a general assignment to them of all the rest of his property, to which H. and S. assented, and they accordingly executed a release not under seal; whereupon G. executed an assignment to H. and S. of his property, but before doing so, he had, without the knowledge or consent of H. and S. assigned to his wife a demand held by him, against a third person, amounting to over $1600; and he executed a mortgage upon the premises, to his wife, to secure a previous debt; *Held* that the assignment of such debt to the wife of G. was a fraud upon H. and S. for which the wife was responsible; and that in an action by H. and S. to foreclose the mortgage she could not claim to have the release established in her favor, except upon the relinquishment by her of the $1600 debt so assigned to her. *ib*

5. The rule in equity is that, as between two parties having equal equities, the prior equity must prevail; but if the party having the subsequent equity clothes himself with the legal title before he has notice of the prior equity, such legal title must prevail. *Newton* v. *Mc-Lean*, 285

### ESTOPPEL.

1. A person who does acts, or makes representations or admissions, designed to influence and which do influence the conduct of another, will be precluded from denying such acts and representations when such denial will operate to the injury of the person so influenced by them. *Lesley* v. *Johnson*, 359

2. Mortgagors, long after the execution of the mortgage, at a time when B. was about to become the assignee thereof, covenanted with him that there was due and unpaid, upon the mortgage $27,222.20, and that there was no set-off, defense or counter-claim thereto. Subsequently, by another instrument, they declared and affirmed that $18,222.20 was still due and unpaid, for principal ($9000 having been paid in the mean time.) These papers were left with B. and exhibited by him to the plaintiff as an inducement for the latter to purchase the bond and mortgage, one of the mortgagors telling him there was over $18,000 of principal due, and assuring him he could have no better investment and no better security for his money. Confiding in these representations, the plaintiff took an assignment of the bond and mortgage and paid B. $18,222.20 for principal, beside the arrears of interest. *Held* that the mortgagors could not be permitted afterwards, to deny what they had thus asserted to be true. That whatever might be the real estate of the mortgage debt and the sum really due and unpaid thereon, as to the plaintiff and those who might claim under him, the mortgagors were *estopped* from disputing that the money paid by the plaintiff was the true sum due and payable, at the time. *ib*

*See* AGREEMENT, 3, 4.
EXECUTION, 4.
HUSBAND AND WIFE, 3.

### EVIDENCE.

#### 1. *Generally ; what is admissible.*

1. A copy of a judgment rendered by a justice of the peace, and of the proceedings to recover the same, signed by the justice with his official signature, and proved by the testimony of a witness to be a correct copy, must, in a collateral action, be regarded as proof of the rendering of the judgment, and of the various proceedings by which it was obtained. *Wilkinson* v. *Vorce*, 370

2. In an action to recover damages for a personal injury resulting in a loss of services, evidence showing how much the plaintiff was earning from his business, or realizing from fixed wages, at the time of the injury, is admissible. *Grant* v. *The City of Brooklyn*, 381

3. The testimony of a person employed by a mortgagee as his attorney and legal adviser at the time of taking a mortgage, in respect to the terms of the bargain between the mortgagors and the mortgagee, upon which the bond and mortgage were executed, is not liable to the objection that the bargain thus made was in the nature of a privileged communication between attorney and client. *Prouty* v. *Eaton*, 409

2. *To establish a lost or destroyed will.* See WILL, 7, 8, 9, 10.

3. *Parol evidence; when admissible.*

4. A bill of sale in this form: " Mr. W. H. bought of B. S. & Brother," naming the articles purchased, and stating the price of each, signifies—especially when read in connection with the fact that the property was delivered under it—that B. S. & Brother have *sold* to H. the articles named, at the prices given. *Bone-steel* v. *Flack*, 435

5. Such an instrument when not made and delivered as a receipt, but to show and evidence the terms of sale, by specifying the species, quantity and quality of the several articles, with the prices, and when it declares, on its face, a sale of the property—if accompanied by a delivery and acceptance of the property, becomes the evidence of the transfer of the title; and it cannot be contradicted by parol evidence that the transaction was not a *sale*, but only a *bailment*. *ib*

6. Upon a sale of goods through a broker, the following sale note was signed by the broker: " Sold Mr. G. H. K. for account of Messrs. H. & E. about twenty tons *divi divi*, at $45 cash per ton, to be put in bags and delivered as soon as possible." *Held* that the instrument was not so far complete as a contract on its face, as to exclude parol evidence of a warranty. *Koop* v. *Handy*, 454

7. A well established exception to the general doctrine which regards all anterior and contemporaneous stipulations and representations as merged in the written contract, exists where one party sues another, alleg-

ing as the *gravamen* some fraud of the latter, by which the former was induced to enter into the contract. *ib*

8. Where the *gravamen* of the complaint was fraud upon the sale of goods, by sample, through a broker; *Held* that parol evidence of the statements of the vendors to the broker, previous to the sale, respecting the quality of the bulk of the article as compared with the sample, was admissible; notwithstanding there was a memorandum of the sale, in writing, signed by the broker, which was silent as to quality of the article sold. *ib*

9. Parol evidence is admissible for the purpose of showing to what debt an acknowledgment of the debtor applied. *McNamee* v. *Tenny*, 495

10. Where a will is unambiguous, accurate and correct in respect to the location and identity of the lands devised, the person intended as devisee &c., parol evidence of extrinsic facts, such as that the country was a wilderness and the lands devised were wild and uncultivated, is inadmissible. *Charter* v. *Otis*, 525

11. Evidence of the declarations of a testator, to show that a prior conveyance by him of a part of the same land to his daughter E. whose children were the plaintiffs, was a gift to her, is also inadmissible. *ib*

See PRACTICE, 2, 3.

EXECUTION.

1. A levy upon goods in a store, under an execution, is a continuing levy covering goods purchased by the judgment debtors subsequent to the levy and during the life of the execution, and placed in the same store; such goods being of the same general description as those levied on, and having been purchased to supply the place of goods sold by the debtors, after the levy, or as an addition to the original stock. *Roth* v. *Wells*, 194

2. Goods and chattels of a judgment debtor, situated within the jurisdiction of the sheriff, are bound by

the lien of the judgment from the time of the delivery of the execution, and no levy is essential to create such lien. *ib*

3. Goods levied upon, being in the custody of the officer, if a portion of them are removed and sold by the debtor, and others of a similar description are put in the same place, the property substituted takes the place of that which has been taken away, and becomes subject to the lien of the execution, without any new levy. *ib*

4. If under such circumstances, the debtor refuses, when called upon, to designate the property which he claims is not covered by the levy, he will be estopped from maintaining an action against the sheriff to recover the value of property taken by him under the execution. *ib*

5. Where goods levied on are left by the officer with the judgment debtor, and he confounds them with other goods, belonging to him, so that they cannot be distinguished, and the debtor refuses to point out the property levied on, he cannot complain if some of his own goods, not embraced in the levy, are taken by the sheriff. *ib*

6. It lies with the party alleging that his property was exempt, under the provisions of the revised statutes, from sale on execution, to prove the facts affirmatively, which go to establish it. *Tuttle* v. *Buck*, 417

7. Until it is made to appear what was the quantity and value of the necessary household furniture retained by a judgment debtor after a sale of his property upon execution, there is nothing from which any inference can be drawn as to whether the property levied on and sold was exempt or not. *ib*

8. It is therefore erroneous for the judge, in an action brought by one who has purchased household furniture from a judgment debtor, against the sheriff for levying on and selling the same under execution against the vendor, to charge the jury that the evidence before them legally tends to prove that the property, when sold to the plaintiff, was exempt from levy and sale by the creditors of the vendor, and that they have the right from the evidence to find such to have been the fact; if in fact there was no proof tending to establish the exemption. *ib*

9. Where liquors are delivered by liquor merchants, to a tavern keeper, to be by him retailed, the title to the property to remain in the liquor merchants until the property is sold, the liquors are liable to seizure and sale under executions issued against the tavern keeper. *Bonesteel* v. *Flack*, 435

10. Where the assignee of a judgment knew, as did the sheriff also, that certain lands held by the judgment debtor and others as tenants in common had been voluntarily partitioned by the tenants among themselves, and quit-claim deeds executed in pursuance of the partition, and that the lots apportioned to and accepted by the judgment debtor were abundantly sufficient to satisfy the judgment with the expenses of sale, yet they proceeded to sell, on execution, the lots set off on such partition to the plaintiff, one of the joint tenants, wholly regardless of his rights and equities; *Held* that this was a fraudulent act, none the less reprehensible because committed under the guise of legal sanction; and that an action would lie against the holder of the judgment, and the sheriff, to set aside the sale, and cancel the sheriff's certificate. *Cantine* v. *Clark*, 629

11. Although a party can obtain an order, in such a case, *it seems*, before the sale, directing the sheriff as to the mode of executing the process; or may obtain relief on motion, *after* the sale, he has also a remedy by direct action; and will be entitled to relief in such action, although *fraud* is not charged in terms, nor proved or found by the court; provided facts are stated, proved and found from which fraud is, in law, necessarily deducible. *ib*

## EXECUTORS AND ADMINISTRATORS.

1. Proceedings by attachment against executors are inapplicable for the

purpose of compelling the settlement of the estate of the testator, or of enforcing payment by the executors, of an individual demand contracted by the testator, where the executors are not charged with any breach of duty, except a neglect to pay the debt. *Metcalf* v. *Clark*, . 45

2. An ordinary action at law cannot be maintained, in this state, against foreign executors, as such, since the office of executor *de son tort* was abolished by statute. *ib*

3. But this objection to the action is matter of defense. It cannot be urged on a motion to set aside the summons. *ib*

4. Our courts will not recognize the right of a foreign executor or administrator *to sue* in the courts of this state under or by virtue of his foreign letters testamentary or of administration. *Middlebrook* v. *The Merchants' Bank*, 481

5. But if foreign executors, with full authority to do so, transfer to another stock in a bank located here, and execute a power of attorney for its transfer on the books of the bank, the officers of the corporation are bound to recognize the assignee's title to the stock, and his right to have it transferred to him on the transfer books; and in case of refusal, the bank may be decreed to make the transfer, where there are no rights of domestic creditors to be affected. *ib*

*See* SURROGATE, 1, 2.

EXEMPT PROPERTY.

*See* EXECUTION, 6, 7, 8.

F

FALSE IMPRISONMENT.

*See* CONSTITUTIONAL LAW, 3.

FENCES.

1. The provision of the statute (1 R. S. 353, § 30) directing that owners of adjoining lands shall each make and maintain a just proportion of the division fence between them, unless one of them shall choose to let his land lie open, was intended to apply to cases where lands have been partially fenced, as well as to those in which the owner chooses to let his land lie altogether in common. *Chryslar* v. *Westfall*, 159

2. The language of the statute includes any case where the owner does not choose to enclose his land entirely. *ib*

*See* ADVERSE POSSESSION.

FORECLOSURE SUIT.

*See* MORTGAGE, 6.

FRAUD.

*See* PARTICEPS CRIMINIS. PARTNERSHIP, 4.

FRAUDS, STATUTE OF.

1. M. & C. being indebted to W. sold him a bill of goods, the price of which was not applied by receipt or otherwise to the debt, nor was there any proof of an agreement that it should be so applied, but on the contrary it appeared from the bill of parcels that the purchaser was to give a note at ten months, payable to his own order; *Held* that there was no payment of a part of the purchase money which would take the case out of the statute of frauds. *Wylie* v. *Kelly*, 594

2. An agreement was made by M. & C. to sell a lot of goods in store to W.; a record of the sale was made, in M. & Co.'s book of original entries; a bill made out and delivered or sent to W.; the goods were set out, by themselves, on one side of the store, and an account taken of them; and W. consigned them to D. for sale on his account. *Held* that there was sufficient evidence of delivery and acceptance to go to the jury; and that the question of delivery should have been submitted to them. *ib*

FRAUDULENT REPRESENTA-
TIONS.

A plaintiff alleged, in his complaint, that being the owner of a farm, he, on the 28th of April, 1858, conveyed the same to the defendant for the price or sum of $11,000 which was paid in ninety shares of stock (of $100 each) in the La C. and M. Rail Road Co. That the defendant falsely and fraudulently represented to the plaintiff that such stock was legally issued to the defendant and his partner, C., upon subscriptions fully paid, which representations were false and made fraudulently, with knowledge that they were false, and were made for the purpose of obtaining a conveyance of the land. The plaintiff then alleged that such stock was worthless and invalid, and was known by the defendant to have been issued at fifty cents on a dollar, in violation of the charter of the company, but that he fraudulently concealed that fact from the plaintiff. The plaintiff further alleged that the defendant, for the purpose of fraudulently inducing the plaintiff to exchange his farm for said stock, falsely represented that the said corporation was in a sound, solvent and prosperous condition, and was able to pay from its income large dividends, which representations the defendant, being its general fiscal agent, knew to be false; and that relying upon the truth of such representations, and the validity of the certificate of stock, the plaintiff executed the deed, and was thereby defrauded. *Held,* 1. That if there was any material variance between the pleadings and the proofs the court should have allowed an amendment of the complaint in conformity with the facts proved. 2. That although it was averred in the complaint that the plaintiff relied upon the fraudulent representations, as to the condition of the company, and that the certificate was valid, it was not essential that both those allegations should be proved to be false. That if it appeared satisfactorily that the former was false and made for the purpose of inducing the plaintiff to make the exchange, this would be sufficient to establish the 'cause of action, and that the latter averment might be rejected as surplusage. 3. That assuming that the pleadings were sufficient, or might have been amended, the judge at the trial erred in granting a motion for a nonsuit and in refusing to submit to the jury the question of fraudulent representations as to the soundness and solvency of the company. 4. That all matters bearing upon the question of fraudulent representations, or going to show that the statements of the defendant as to the condition of the company, and the value of its stock, were false, to his knowledge, were proper subjects for the consideration of the jury, to whom they should have been submitted by the judge. 5. That it was also a question for the jury whether the plaintiff, although he had some general knowledge of the character and responsibility of the corporation, was governed by the representations of the defendant, who was its financial agent and had been connected with its management, and had an intimate knowledge of its affairs. 6. That whether representations made by the defendant on the same day and only a short time before the agreement was executed, were designed to influence and did influence the plaintiff; and whether they were made in reference to the contract; were also questions which properly belonged to the jury to decide. *Yates* v. *Alden,* 172

G.

GUARANTY.

1. Where a corporation indorses upon an interest-warrant, or coupon, issued by another company, a guaranty of payment, "for value received," it is not to be deemed an accommodation indorser or guarantor. The words "value received" import a sufficient consideration. *Connecticut Mutual Life Insurance Co.* v. *The Cleveland &c. Rail Road Co.* 9

2. An arrangement between several connecting rail road companies, entered into for the purpose of securing a uniform gauge of the several roads, and thus increasing the business and profits of each, forms a sufficient consideration for a guar-

anty by one of the corporations, of the payment of the coupons issued by another. *ib*

3. A guaranty of the payment of interest-warrants annexed to a bond may be valid, though the bond be void. *ib*

## HIGHWAYS.

1. After an appeal from the determination of commissioners of highways in laying out a highway has been heard before the referees appointed by the county judge to decide such appeal, and submitted to them for their decision, they have no power to reopen the case and receive further testimony. *The People ex rel Robinson* v. *Ferris*, 121

2. After the matter of the appeal has been submitted by the parties to the referees, their power for further *hearing* is at an end. The only power then left to them is to decide; which includes the incidental powers of adjourning from time to time, for that purpose, and to sign and cause to be filed the evidence of their decision. *ib*

3. Where the legislature, by special statute, declares that all streets, roads and alleys in a particular village which have been worked and improved and which are now used as such, shall be deemed public highways, the character of the streets, roads and alleys, and whether highways or not, is thenceforth to be determined not by the rules of the common law or the general statutes relating to highways, but by inquiring simply whether, as a matter of fact, any particular street or alley comes within the provisions of the statute. *Hickock* v. *Trustees of the Village of Plattsburgh*, 130

4. Overseers of highways, acting under the general authority of the trustees of a village, who are by law commissioners of . highways, and without directions as to the specific application of labor, under their warrants, may create a liability on the part of the trustees, by applying the labor to the improvement of a particular street. *ib*

5. Unless such acts of the overseers are repudiated or disavowed by the trustees they will be presumed to have ratified them. *ib*

6. The question whether a *cul de sac*, or a road or street which is closed at one end, and only communicates with a public road or street at the other, can be a *highway*, discussed. *ib*

## HUSBAND AND WIFE. .

1. The power conferred upon married women to *devise* real and personal estate, by the act of April 11, 1849, amending the act of April 7, 1848, for the more effectual protection of the property of married women, was not repealed by the act of March 20, 1860, concerning the rights and liabilities of husband and wife. *Wallace* v. *Bassett*, . 92

2. .Deeds of present separation, between husband and wife, are valid . so far as relates to the trusts and covenants by which the husband makes provision for the wife, and the indemnity given to the husband by the trustees. Such covenants are mutual and dependent. *ib*

3. By articles of separation, between husband and wife, the former covenanted that the latter might enjoy all her estate, goods, &c. that belonged to her when she was married; and that he would not claim or demand any property which she should thereafter own, or which should be devised or given to her, or which she might otherwise acquire; and he conveyed to the trustees certain real and personal property and agreed to convey other real estate, in trust for the wife's support. The trustees agreed to take the estate so conveyed and to be conveyed, in full satisfaction for the support and maintenance of the wife; and the property was to be disposed of as the wife and the trustees might deem proper. The trustees also agreed to indemnify the husband against the wife's debts or the expenses of her support &c. The husband afterwards conveyed to the trustees the real estate agreed to be conveyed. *Held* that the husband was *estopped* by the covenants in the deed of separation, from

claiming, after the death of the wife, a life estate in the land so conveyed by him to her, under the tenth section of the act of March 20, 1860, as her survivor. *ib*

4. A married woman, having a separate estate in lands, but not in the rents and profits thereof, not conducting any business on her own account, cannot charge such separate estate by a parol promise to pay the debt of her husband, where her separate estate has received no benefit on account of the contracting of the debt, and will not be benefited by the payment of the debt. *Ledlie* v. *Vrooman*, 109

5. Where a married woman, having a separate estate in lands, conveys the same by deed with covenants of seisin and against incumbrances, she is bound by the covenants, and liable for a breach thereof; such covenants being directly beneficial to her separate estate, inasmuch as their effect is to assure the title and enlarge the purchase money. *Kolls* v. *DeLeyer*, 208

6. Since the act of 1848, in relation to the rights of married women, when the wife is in possession of property under claim of ownership, her rights as owner cannot be overlooked without evidence, any more readily than if she were unmarried. *Peters* v. *Fowler*, 467

7. The statute has worked this change; and instead of an adverse presumption that the property connected with a business which she carried on before her marriage, and which she claimed to own as a single woman, with the property in her possession, belonged to the husband, the presumption is now in her favor, and must be overcome by the party who disputes her right or title. *ib*

8. The fact of coverture has ceased to have any relation to the technical right of a married woman to maintain an action in respect to her separate property; and the allegation of coverture, in the complaint, is no longer necessary. *ib*

9. A husband may be liable for necessaries furnished to the wife, in certain cases, though the existence of an agency or assent, express or implied in fact, is wholly disproved by the evidence; and this upon the ground of an agency implied *in law*, though there can be none presumed in fact. *Cromwell* v. *Benjamin*, 558

10. A husband is legally bound for the supply of necessaries to his wife, so long as she does not violate her duty as wife. He may discharge this obligation by supplying her with necessaries himself or by his agents, or by giving her an adequate allowance in money; and then he is not liable to a tradesman who, without his authority, furnishes her with necessaries. *ib*

11. But if he does not himself provide for her support, he is legally liable for necessaries furnished to her by tradesmen, *even though against his orders*. *ib*

12. Where goods have been thus furnished by a tradesman, the only questions to be considered are, whether the husband failed to provide suitably for his wife's support, and whether the articles sold by the plaintiff were necessaries. *ib*

13. And if there is *some* evidence to sustain the finding of a referee, upon those questions, his decision will be conclusive. *ib*

14. An action may be maintained by a borrower, against husband and wife jointly, to recover back money paid as usurious interest, where the money loaned, and the security taken therefor, belonged exclusively to the wife, as a part of her legal estate, and the money taken for the loan and forbearance was paid to and received by her, and the husband, so far as he participated in the transaction, acted for her and with her knowledge and assent. *Porter* v. *Mount*, 561

15. Under the provisions of the acts of 1848 and 1849 for the more effectual protection of the property of married women, a married woman, having a separate legal estate consisting of money, may lend the same, take and hold securities therefor in her own name, and sue for and enforce them at law. And the power to do these things in-

: cludes the ability to make all the contracts incident thereto. She is not exempt from the liabilities which the law imposes upon all other lenders of money.　　　　*ib*

# I

## INJUNCTION.

*See* DEBTOR AND CREDITOR, 2, 3.
PRACTICE, 5, 6, 7, 8.

## INFECTIOUS DISEASES.

*See* ACTION, 4.

## INSOLVENT.

*See* ATTACHMENT.

## INSURANCE, (FIRE.)

1. An assessment made by an insurance company upon its premium notes, which includes the amount of a previous assessment for losses that have been paid, is invalid and cannot be collected. *Cooper* v. *Shaver,* 151

2. Premium notes, constituting the capital and being regarded as assets of a mutual insurance company, are ultimately liable for the payment of debts of all classes. It is therefore proper to assess them to pay losses on cash or stock policies issued by the same company.　　*ib*

3. Where it appeared that several years prior to the appointment of a receiver an insurance company had no funds to pay losses; and the order of reference directed the referee to ascertain the amount of debts &c., and to make an assessment to pay such debts; *Held* that it was a fair and legitimate inference that the cash premiums were exhausted, and that a necessity for resorting to the premium notes existed.　*ib*

4. The provision contained in section 13 of chapter 466 of the laws of 1853, requiring notice of an assessment upon premium notes to be published for three weeks, by the

secretary of the company, is merely directory, and the publication of such a notice is not a condition precedent to a recovery of an assessment by a receiver of the company.　　*ib*

5. After sequestration the corporate powers of an insurance company are suspended, and there is no such officer to perform that duty. Hence that provision cannot be literally carried out. *Per* MILLER, J.　　　　　　　　　　　　*ib*

6. Actual notice of the assessment is the main thing. And if demand of the amount be made, by the receiver, before the commencement of a suit therefor, this is sufficient.　　　　　　　　　　　　*ib*

7. A lease, executed by the mayor &c. of New York to R. and others was upon the condition that the lessees should erect on the demised premises such a building as was described in a certain petition and resolution; and at the expiration of the term quit and surrender the premises in as good state and condition as reasonable use and wear thereof would permit. The rent reserved was nominal only. *Held* that the future ownership by the lessors, of the building to be erected by the lessees, was in the contemplation of the parties at the time the lease was executed; and that at the expiration of the term the lessors became the owners of the superstructure which had been erected in pursuance of the conditions of the lease, and had an insurable interest therein. *Mayor &c. of New York* v. *The Brooklyn Fire Ins. Co.* 281

8. *Held, also,* that the lessors having been in possession of the building erected by the lessees, under a claim of ownership, at the time of procuring an insurance by them upon the same, the insurers could not be allowed, in an action on the policy, to dispute the lessor's interest in the building; even if the title was acquired by an act constituting a trespass as against the lessees, or their receiver.　　　　　*ib*

9. Verbal statements, made by the agent who effects an insurance for the owner of the property, in respect to the future occupation of the building, are not admissible in

in evidence in an action upon the policy, inasmuch as such evidence would tend to vary the operation and effect of the language contained in the policy. *ib*

10. If there is any warranty as to the future use or occupation of the property insured, it must be contained in the policy or be reduced to writing in proper form, before it can be admitted to affect the construction or obligation of the policy. *ib*

11. Where the property described in a policy, and the purposes to which it is dedicated, sufficiently indicate the character and nature of the articles to be kept there, and the business to be transacted, and the nature and extent of the risk must have been known to the insurers to embrace articles and pursuits specified as hazardous, extra-hazardous and special hazards, the carrying on of a business, in the building, denominated hazardous or extra-hazardous or specified in the memorandum of special rates, without permission of the insurers, will not vitiate the policy. *ib*

12. Where an agent of an insurance company, authorized to effect insurances on vessels, &c., and to procure policies from the company and deliver them to the insured, receives and accepts an application, and negotiates an insurance, as agent, on property of which he is one of the owners, and communicates the transaction to his principal, without disclosing his interest in the property, and on receiving a policy from the company, delivers the same to the insured, such policy is void. *Ritt* v. *The Washington Marine and Fire Ins. Co.,* 353

13. It is the duty of an agent of an insurance company to acquire the proper information, and make the necessary examination, to lead to an intelligent decision upon the acceptance or rejection of the risk offered. The company has a right to the exercise of the agent's disinterested skill, diligence and zeal, for its own exclusive benefit. *ib*

14. And while acting as agent, he cannot at the same time upon himself incompatible duties and characters; or become agent in a

transaction, where he has an adverse interest or employment. *ib*

15. An insurance, produced in that manner, is not avoided on account of the materiality of the relation of the agent to the risk, but because it is against public policy to allow such agreements to stand. *ib*

16. Even if it could be shown that the relation was not material to the risk, the insurance would be void. *ib*

## INSURANCE COMPANIES.

1. An insurance company, although authorized to receive notes for advanced premiums to be written against, and to allow a certain interest thereon, is not authorized to allow five per cent on the whole amount, without deduction for such sums as may be written against. *Chesbrough* v. *Wright,* 28

2. After the existence of an insurance company is once established according to the provisions of the statute, upon proper evidence, its validity cannot be questioned, or its legal existence denied, by any of its members. *Cooper* v. *Shaver,* 151

3. Persons who have given premium notes to a mutual insurance company, and have thus become members of the corporation, are not in a condition to assail the organization of the company. *ib*

## INTEREST.

If interest coupons, annexed to a bond issued by a rail road company, are not paid, when due, interest should be allowed, by way of damages for non-payment. *The Connecticut Mutual Life Ins. Co.* v. *The Cleveland, &c. Rail Road Co.,* 9

## INTERPLEADER.

1. A debtor who has been served with a notice that an attachment has been granted against the property of his creditor, has no standing in court to interplead his creditor and the plaintiffs in the attach-

ment. *United States Trust Co.* v. *Wiley*, 477

2. Where a trust company received a sum of money in deposit, and issued a certificate to the depositors, by which it agreed to allow interest at the rate of four per cent, and to re-pay the sum deposited, to the de-positors or their assigns, with inter-est, on sixty days' notice ; *Held* that the company could not bring a suit to compel the depositors, and creditors who had attached the fund in the plaintiffs' hands, to interplead in respect to their respective rights and equities in the fund. *ib*


J

JUDGE'S CHARGE.

*See* PRACTICE, 3.


JUDGMENT.

A justice of the peace rendered a judgment in favor of the plaintiff for $98 damages and $4.65 costs, in all $102.65, and duly entered it in his docket. ' A few days afterwards, discovering that he had by·mistake made his costs 69 cents less than he was entitled to, he undertook to correct the error by setting that sum underneath the original foot-ing and adding them together, with-out erasing or altering any part of the original docket. But after-wards, finding that it was illegal to alter a judgment, he erased the ad-dition and thus restored the docket to its original form. *Held* that these alterations did not make the judgment void. That being made after the time limited by statute for the justice to render judgment and enter it in his docket, they were clearly *void* acts, as much as if they had been done by a stranger ; and being void they could not affect the judgment. *Dauchy* v. *Brown*, 555

*See* DIVORCE, 6, 7, 8, 9.
　　EVIDENCE, 1.
　　JUSTICES' COURTS, 3, 4, 8, 11, 12, 15.
　　MALICIOUS PROSECUTION, 1, 2, 3, 4.


JURISDICTION.

Where bonds and coupons, though ex-ecuted in the state of Ohio, are pay-able in the state of New York, the cause of action arises here, and this court has jurisdiction, though both parties are foreign corporations. *The Connecticut Mutual Life Ins. Co.* v. *The Cleveland &c. Rail Road Co.*, 9

*See* JUSTICES' COURTS, 4, 5, 6, 7, 8.
　　SPECIFIC PERFORMANCE, 4, 5.


JUSTICES' COURTS.

1. The limitation of time, in the stat-ute directing that justices of the peace shall render judgment and enter the same in their dockets within four days after the submis-sion of the cause, was intended for the convenience of the parties. and the protection of their rights ; and a compliance with the statute may be waived by them. *Barnes* v. *Badger*, 98

2. When any act is deferred beyond the time limited in the justices' act, by the consent of the parties, it is no error that the act is done after the time specified in the act, if done within the agreed time. *ib*

3. Where parties submit their cause to the justice, and stipulate with each other that the justice may take five days instead of four, to render judgment, *it seems* they will be *es-topped* from ever alleging in a court of justice, · as a ground of error, that the judgment was rendered on the fifth instead of the fourth day. *ib*

4. A justice of the peace issued a sum-mons, on the 28th of November, 1856, returnable on the 5th of De-cember, then next, at *one o'clock P. M.*, which was duly served and returned. On the return day the justice, by mistake and supposing that the summons was returnable at *nine o'clock A. M.*, called the action at 10 o'clock A. M. and tried the same upon the testimony, and rendered a judgment in favor of the plaintiff. *Held* that the judg-ment was void for want of jurisdic-tion, and constituted no bar to a subsequent action for the same cause. *Sagendorph* v. *Shult*, 102

5. The day and hour fixed in the sum-mons for its return is the period when the justice takes *jurisdiction of*

*the action*, and not the time when he issues the summons. At the return day he is to receive the complaint, which shows the cause of action; and at that time the question of jurisdiction of the action is judicially determined. *ib*

6. The authority exercised by the justice, previous to that stage of the cause, in issuing the summons, is merly *ministerial*. *ib*

7. When a legal summons, issued by a justice of the peace, has been duly served and returned, the justice, after waiting an hour from the time named in the summons for the appearance of the parties, obtains jurisdiction of the person of the defendant, whether he be present or not. *ib*

8. If justices proceed without having acquired jurisdiction over the parties in the form and in the manner required by law, any judgment which they may render will be absolutely void. *ib*

9. A venire should not be delivered to a constable, by a justice of the peace, until the parties have had an opportunity to make all resasonable objections to such officer. *Rice* v. *Buchanan*, 147

10. Where a venire was issued by a justice on the demand of the defendant, out of court and in the absence of the plaintiff, and was delivered to a constable without the knowledge of the plaintiff, or any notice to him of the application therefor; *Held* that the justice was right in setting aside the venire, and the panel of jurors, returned by the constable, and in issuing a new venire. *ib*

11. A judgment rendered by a justice of the peace who is related to either of the parties is absolutely void. *Schoonmaker* v. *Clearwater*, 200

12. The statute having declared that no judge of any court " can sit," in such a case, all the acts of the justice are *coram non judice* and of no effect whatever; and this although no objection was made to the exercise of jurisdiction, at the trial, and no proceedings have been had to set aside or vacate the judgment. *ib*

13. One serving a summons issued by a justice of the peace under a special authority given to him by the justice, is to be deemed a constable *quoad* the action, and is prohibited from appearing and acting as counsel for the plaintiff on the trial. *Wilkinson* v. *Vorce*, 370

14. His appearance on the trial is an error for which the judgment and proceedings will be reversed, on appeal. But it will not affect or take away the jurisdiction and authority of the justice to proceed in the action. *ib*

15. The justice having acquired jurisdiction of the person of the defendant, and become completely possessed of the action, by the issuing and service of a summons in the manner required by law, his judgment, rendered in such action, will, until reversed, be valid and effectual, and good authority for the issuing of an execution, notwithstanding such irregular appearance for one of the parties. *ib*

*See* JUDGMENT.

# L

## LEASE.

A lease, not purporting to reserve to the lessor the products of the farm, but merely providing that the lessor shall have a lien as security for the rent, upon all the goods, wares, chattels, implements, fixtures, tools and other personal property which are or may be put upon the demised premises, if it could be construed a chattel mortgage, would be void for uncertainty; as not identifying any particular property, so that it can be known to what it was intended to apply. *Buskirk* v. *Cleveland*, 610

*See* INSURANCE, (FIRE,) 7.

## LIMITATIONS, STATUTE OF.

1. An acknowledgment, to take a case out of the operation of the statute of limitations, need not express any

intention to pay the debt. An intention to pay is to be presumed. *McNamee* v. *Tenny*, 495

2. If the debtor acknowledges the existence of the debt, in writing, the provisions of the law are met, and the statute of limitations will not attach. *ib*

3. What is a sufficient identification of the debt, in the acknowldgment. *ib*

4. In the absence of proof that other demands existed, to which the acknowledgment of the debtor might apply, the presumption is that it applied to the demand proven. *ib*

5. To remove any uncertainty or doubt upon that subject, parol evidence is admissible. SUTHERLAND, J. dissented. *ib*

6. In October, 1855, H. being indebted to P. in the sum of $26.50 for a set of tomb-stones, arranged with S., a debtor of his, that S. should pay that sum to P. upon delivery of the stones. But P. being indebted to the plaintiff upon a promissory note dated January 30, 1854, payable one day after date, P. agreed with the plaintiff that the latter might receive from S. the price of the stones, and apply the amount thereof upon the note, and P. thereupon delivered the stones to the plaintiff for S., who had previously consented that the parties might make this arrangement, and had notice that it was made, and assented to it soon after if was made. *Held* that the effect of the transaction was to substitute S. in the place of P. as debtor to the plaintiff, for the price of the stones, and that it operated *in presenti*, as a payment of such price, upon the note. *Butts* v. *Perkins*, 509

7. *Held* also, that the agreement canceled $26.50 of P.'s indebtedness on the note, as of the date of the delivery of the stones, and that the plaintiff should have indorsed that sum on the note, as of that date, although he did not receive the same from S. until April 1, 1856. *ib*

8. And that as the $26.50 ought to have been paid by S. and received by the plaintiff, at the time of the delivery of the stones, the payment of that amount upon the note—so far as the question of the statute of limitations was concerned—should be considered as made and received at that time. *ib*

9. The statute which authorizes a party paying usurious interest for the loan or forbearance of money, to sue for and recover the excess, within *one year* next after such payment, is cumulative, and does not take away the common law remedy of the borrower to recover such excess in an action for that purpose, which may be brought at any time within six years. *Porter* v. *Mount*, 561

10. The borrower's common law right of action is not *absolutely* suspended during the three years given to the overseers or superintendents of the poor for suing, by the statute, but he may sue during that period *provided* neither of such officers has previously sued for the same matter, and not otherwise. *ib*

11. If an action has been brought by those officers, previously, it is the duty of the defendant, in an action brought by the borrower, to show that fact, affirmatively. *ib*

12. Section 110 of the code of procedure, which requires that a promise, to take a case out of the operation of the statute of limitations, shall be in writing, is not applicable to cases where the right of action had accrued previous to the adoption of the code. *Coe* v. *Mason*, 612

13. Accordingly *held* that parol promises made in 1851 and 1856, to pay a debt which existed and was in full force at the time the code took effect in 1848, were sufficient to take the case out of the statute of limitations; the case coming within the exception of section 73 of the code. MORGAN, J. dissented. *ib*

14. The legislature intended to confine the operation of section 110 of the code to new liabilities, and not to include pre-existing ones which had been already barred by the statute. *Per* FOSTER, J. *ib*

15. The "right of action," spoken of in the 73d section of the code,

which excepts from the operation of section 110 actions already commenced, and cases " where the right of action has already accrued," means the right of action upon the original obligation, and not the right of action upon the new promise. *ib*

See AMENDMENT, 1, 2, 3.
DEBTOR AND CREDITOR, 3.

# M

## MALICIOUS PROSECUTION.

1. A judgment in favor of a plaintiff in a justice's court, after a trial upon the merits, is sufficient evidence of probable cause to defeat an action against him for malicious prosecution, although on appeal to the county court it is reversed, upon another trial. *Palmer* v. *Avery*, 290

2. It is not however conclusive evidence of probable cause, but may be impeached for fraud, conspiracy, perjury, or subornation. *ib*

3. Where no such evidence is offered to impeach the prior judgment, it is the duty of the court to order a nonsuit. BACON, J. dissented. *ib*

4. The plaintiff is not competent to prove by his own oath, against that of the defendant, that the former judgment was obtained against him by the perjury of the defendant, when the question depends upon their credibility as witnesses. *ib*

5. Where two actions had gone down in consequence of the plaintiff's failure to appear before the justice at the adjourned day, and a new action has been commenced before another justice for the same demand, which is still pending, the litigation is not terminated; and want of probable cause cannot be inferred solely from the discontinuance of the former suits. *Per* BACON, J., FOSTER, J. concurring. *ib*

6. Where such new suit, after a full and fair trial upon the merits, resulted in a judgment in favor of the plaintiff, it furnishes sufficient evidence of probable cause to defeat an action brought by the defendant therein against the plaintiff for malicious prosecution of the prior suits. *Per* MORGAN, J., FOSTER, J. concurring. *ib*

## MARRIED WOMEN.

See HUSBAND AND WIFE.

## MERGER.

See MORTGAGEE, 1.

## MORTGAGE.

1. On the 7th of December, 1857, P. executed a bond and mortgage to B., and on the 26th of July, 1858, P. and wife conveyed the mortgaged premises to D. subject to the mortgage, D. assuming and covenanting to pay the mortgage as a portion of the purchase money. D. afterwards, and previous to July 26, 1859, *paid the mortgage* to the mortgagee, but satisfaction was not acknowledged. On the 26th of July, 1859, the bond and mortgage were delivered by B. to D. together with an assignment executed with a blank for the name of the assignee. On the 30th of July, 1859, D. delivered the bond and mortgage and assignment to K. & P. as collateral security for his stock note for $1500 therewith delivered to K. & P. receiving from them, at the same time, his protested draft for $1500, then held by K. & P. On the 30th of August, 1859, the name of the plaintiff was inserted in the blank left in the assignment, and the same, together with the bond and mortgage, were re-delivered to the plaintiff, in trust for the firm of K. & P. of which he was a member, D. receiving therefor his stock note for $1500, and the firm cancelling debts and evidences of debt they held against him for the remainder of the amount nominally or apparently due on the bond and mortgage, and on the same day the assignment was duly recorded. On the 8th of September, 1859, D. conveyed the mortgaged premises to the defendant A. in fee; the deed stating on its face a consideration

of $8000. *Held,* that there was no necessity, if there was a place, for the doctrine of *merger.* That the mortgage debt having been *paid* by D., the owner of the fee, who had assumed and covenanted to pay it, such payment was a satisfaction of the mortgage debt, and *extinguished* the lien and vitality of the mortgage as fully as payment by P. the mortgagor would have done; whatever might have been the intention of D. and B. And that it was not in the power of D. and B., by any arrangement between them, to keep the mortgage alive, for the benefit of the party making the payment. LEONARD, J. dissented. *Kellogg* v. *Ames,* 218

2. A release of the lien of a mortgage, though void at law if not under seal, may be enforced in equity. *Headley* v. *Goundry,* 279

3. Where one conveys land to another by deed absolute on its face, and the grantee, while thus apparently invested with the legal title, mortgages, the land to a third party for a valuable consideration, the title of the mortgagee cannot be divested by proof that the grantee in the deed held the premises merely in trust for another, without any interest therein, at the time he assumed to execute the mortgage thereon. *Newton* v. *McLean,* 285

4. To overreach the mortgage so given by the holder of the legal title, which vests the mortgagee with a legal estate in the premises, the person claiming to be the equitable owner of the premises is bound to go further than simply to show his prior equity. He must show that the mortgagee had notice of such prior equity, before advancing the consideration for the mortgage. *ib*

5. Payment and discharge of a mortgage given as collateral security for the payment of a prior mortgage, operates as a payment upon the principal debt. *Prima facie* there is nothing else upon which the money paid can apply. *Prouty* v. *Eaton,* 409

6. Although the defendants, in an action to foreclose a mortgage, fail to set up in their answer, distinctly, the defense of payment, alleging merely an accord and satisfaction, and that nothing remains due, yet if evidence showing that the debt has been paid, is received, without objection, the defendants are entitled to the benefit of such proof. *ib*

See EQUITY, 1.
ESTOPPEL, 2.

## MUNICIPAL CORPORATIONS.

1. The streets of a great city being in constant use by passengers, during the night as well as day, if the municipal corporation undertakes a work—such as the construction of a sewer—which necessarily renders the street unsafe for night travel, it is bound to avert the danger to passengers by special precautions, such as signal lights and barriers, and even more than these, should they prove ineffectual. *Grant* v. *The City of Brooklyn,* 381

2. Where a municipal corporation, in opening a sewer in a street, threw the earth upon the side-walk usually traveled by foot passengers, and left it there during the night, without any signal light or barrier, or protection erected around or near it, to warn or turn passengers away from the danger, and the plaintiff, while passing along the side-walk at night, in consequence of the obstructions, fell into a hole and was injured; *Held* that the corporation was guilty of negligence to which the plaintiff had not contributed, and was liable for the injury occasioned thereby. *ib*

See HIGHWAYS, 3.

# N

## NEGLIGENCE.

See EMPLOYER AND EMPLOYEE.
MUNICIPAL CORPORATIONS.
RAIL ROAD COMPANIES, 5, 6, 7.

# O

## OFFICE AND OFFICER.

The act of April 12, 1856, (*Laws of* 1856, *p.* 285,) relative to common

schools, required the board of supervisors of the several counties to meet on the 3d day of June in that year, and elect a school commissioner, for each assembly district, who should hold his office until January 1, 1858. Section 7 directed that at the general election to be held in 1857, "and every three years thereafter," there should be elected a school commissioner for each assembly district, who should enter into office on the 1st of January, 1858, and should hold office for three years and until his successor should have qualified &c. Section 9 authorized any commissioner to resign his office, and for the appointment by the county judge of a successor to fill the office till the next general election thereafter. A vacancy occurring in the office of school commissioner in Chemung county, in September, 1862, by the resignation of the incumbent, whose term of office would have expired on the 31st of December, 1863, M., was appointed by the county judge, to fill the vacancy. At the general election in November, 1862, McK. was duly elected to that office, without any thing in the notice of election to show that it was to fill a vacancy; and he immediately entered upon the duties of the office. At the general election in November, 1863, M. was elected to the said office, and on the 1st day of January, 1864, claimed to hold the same, and to enter upon the duties thereof, while McK. claimed still to hold the office. *Held*, 1. That the appointment of M., in September, 1862, to fill a vacancy, only entitled him to hold the office till the general election in November thereafter. 2. That the vacancy in the office, occurring in September, 1862, did not change the time of electing the commissioner, so that one was not thereafter to be elected "every three years," dating from the general election in 1857. 3. That section 9 of the statute should be construed as relating exclusively to vacancies, and the filling of them; and that there was no incongruity between it and section 7. 4. That McK.'s election in 1862 must be deemed to have been only for the vacancy, and that his term of office commenced at the date of such election,

and expired on the last day of December, 1863; and that M. was duly elected at the general election in 1863, for the term of three years, commencing on the 1st day of January, 1864, and was entitled to the office, with the fees and emoluments from that time. *People ex rel. Marshall* v. *McKinney*, 515

*See* SHERIFF.

# P

## PARENT AND CHILD.

The liability of a father to furnish necessaries for his minor and invalid children who are members of his family and unable to support themselves by their labor, depends upon principles analogous to those which govern the relation of husband and wife. *Cromwell* v. *Benjamin*, 558

## PARTICEPS CRIMINIS.

1. C. having obtained from F. and his wife, without consideration, a conveyance of a farm, upon a parol promise or agreement to take and hold the title until F.'s debts were arranged or paid, and then to convey the land to F.'s wife; *Held* that he could not resist the claim of F. and wife that the parol agreement be specifically executed, on the ground that the conveyance was made by F. to hinder, delay and defraud his creditors; or on the ground that the agreement was within the statute declaring all parol trusts relating to land void. *Freelove* v. *Cole*, 318

2. If parties engaged in the perpetration of a fraud or concurring in the fraudulent purpose, as *particeps criminis*, are *in pari delicto*, neither can have relief, as against the other, at law or in equity. *ib*

3. But as there are degrees of crime and of wrong, the courts can and do give relief in many cases, as against the more guilty party. *ib*

4. To exclude relief, in such cases, the parties must not only be *in delicto*, but *in pari delicto*. *ib*

5. Where the parties to a conveyance did not stand on an equal footing, the grantor being infirm of mind and incompetent to manage his business affairs with ordinary prudence and discretion, and the grantee was his son in law, confidential friend, and legal adviser, and was applied to for advice on this occasion; *Held* that the grantor was not prevented from applying to a court of equity to enforce the performance of a parol agreement by the grantee, to reconvey the premises, although the object and intention of the grantor, in making the conveyance, was to place his property beyond the reach of his creditors; and the conveyance was in fact fraudulent as against such creditors.    *ib*

6. *Held also*, that the grantee, although not in fact a licensed attorney, but only practicing as counsel in justices' courts, was in principle clearly within the rule applicable to attorneys.    *ib*

PARTIES.

1. When an action is duly commenced against commissioners for loaning certain moneys of the United States, under the act of April 4, 1837, it is in effect brought against the state, and not against the commissioners personally. *Plumtree* v. *Dratt*, 333

2. It is therefore absolutely necessary to bring the state before the court, as a party, in the form prescribed by the statute, to enable the court to give any relief to the plaintiff. *ib*

3. If the complaint describes the defendants as " Commissioners of loans of the county of W." the addition to their names will be considered as merely *descriptio personarum*, and the action will not be deemed as brought against them in their official character as commissioners under the act mentioned.    *ib*

4. And if the objection is distinctly taken by demurrer, the plaintiff cannot be allowed to proceed in his action, but must amend.    *ib*

PARTNERSHIP.

1. Where A., in pursuance of a parol authority from B. purchases stock in his own name, on the joint account of himself and B., the latter becomes the owner of one half of the stock, and liable to pay A. the amount advanced therefor. *Stover* v. *Flack*,    162

2. No written assignment of the stock from A. to B. is necessary to render B. liable for his proportionate share of the purchase money.    *ib*

3. Where A. buys and pays for stock at B.'s request, on joint account, under an agreement that B. shall pay him for the moneys advanced, A. holding the stock, in the mean time as a pledge for repayment, with a right to expose it for sale in the market, if upon notice B. refuses to pay for it, A. is not bound to sell the stock in market, if it be worthless, before commencing a suit against B. to recover the amount advanced on the purchase. Such an agreement, though by parol, is not void by the statute of frauds.    *ib*

4. A division by partners, of the co-partnership assets between themselves, and the transfer of such assets by the individual partners in payment of their private debts, when the partnership is insolvent, is in point of law a fraud upon the creditors of the partnership. *Ransom* v. *Van Deventer*,    307

5. Such a transfer of the partnership effects is invalid, as against the creditors of the firm, and the property remains partnership property until it comes to the hands of a *bona fide* purchaser for a valuable and new consideration.    *ib*

6. If the person to whom the property is transferred has notice that it is partnership property, and he takes it in payment of a precedent debt, he will not be deemed a *bona fide* purchaser.    *ib*

*See* TRUST AND TRUSTEE.

PAYMENT.

*See* MORTGAGE, 1.

PENALTY.

*See* AGREEMENT, 14.

## PERSONAL INJURIES.

*See* EVIDENCE, 2.

## PLEADING.

*See* COMPLAINT.

## PRACTICE.

1. Where a defendant, residing in Canada, was inveigled into this state by a trick, for the purpose of effecting a service of the summons upon him, the service of the summons and all proceedings dependent thereon, were set aside, and a warrant of attachment vacated. *Metcalf* v. *Clark*, 45

2. Whether or not the evidence on one side tends to establish a particular fact, is a question of law for the court; while its weight, and convincing force, are questions for the jury. *Tuttle* v. *Buck*, 417

3. An exception will always lie to an erroneous charge or ruling as to the legal tendency of the evidence. *ib*

4. Section 324 of the code applies as well to injunction orders as to other orders. The special provision made by section 225 is in addition to the powers conferred by section 324, and is not a substitute for them. *Peck* v. *Yorks*, . 547

5. Hence, a judge of this court, or a county judge, has power, on an *ex parte* application, to vacate or modify an injunction order made by himself, without notice. *ib*

6. But this power is not to be used under all circumstances, without regard to the rights of parties to be affected thereby ; nor should it be left to each judge to determine for himself under what circumstances he will exercise it. *ib*

7. A judge should never vacate or modify an injunction order, without notice, except when, from the urgency of the case, it is necessary to guard against serious loss which

sometimes may be occasioned by the delay incident to serving notice. *ib*

8. Where the application to modify an injunction order was not made till more than a year had elapsed after service of the injunction upon the defendants, or some of them, and not till after all of them, except one, had appeared and answered, *it was held* that an *ex parte* order modifying the injunction, without notice, was improvidently granted. *ib*

9. Upon an application for an order that the service of a summons may be made by publication, pursuant to the provisions of section 135 of the code, the applicant must not only show that the case falls within some one of the five subdivisions of that section, but he must also establish the jurisdictional fact that the person on whom the service of the summons is to be made cannot, *after due diligence, be found* within the state. *Peck* v. *Cook*, 549

10. The circumstance that such person is a non-resident is of no importance, except as it tends to establish the fact that he is not within the state at the time when the application is made. *ib*

11. If the affidavit upon which an order for publication is granted is insufficient, the plaintiff will not be aided by the fact that after the order for publication was made, the summons and complaint were served upon the defendant, personally, out of this state. *ib*

*See* FRAUDULENT REPRESENTATIONS. REVIVOR OF SUIT.

## PRINCIPAL AND AGENT.

1. An agent, who is commissioned by his principal to purchase a certain specific amount of property, is a special agent, and can no more purchase a smaller than a larger quantity of what he is commissioned to purchase. *Olyphant* v. *McNair*, 446

2. Thus where McN. authorized M. to purchase, for him, five hundred shares of the capital stock of a mining company, and M. purchased

oue hundred shares, only; *Held* that McN. was not bound to refund to M. the sum advanced.                    *ib*

3. Though there may be cases where the purchase of a smaller quantity than that ordered would be deemed valid, as an execution of the authority *pro tanto*, yet such cases can only occur where an express or implied *discretion* was commited to the agent, in the exercise of his authority.                    *ib*

4. If the power of making and indorsing promissory notes for and in the name of a corporation is not expressly conferred upon its agent and attorney, by the instrument by which he is appointed, 'general words, at the conclusion thereof, authorizing him " to do all other acts and things for and in behalf of the said company that he may deem proper to further and protect its interests," cannot have that effect. SUTHERLAND, J. dissented. *Lawrence* v. *Gebhard,*                    575

5. Proof that the agent of a corporation is in the habit of giving notes for the company is inadmissible, unless accompanied by proof that the company had some knowledge that the agent was in the practice of giving notes in its name.                    *ib*

6. The fact that such agent is a director gives him no authority, except when acting as a member of the board; unless there is some by-law conferring power upon him.                    *ib*

*See* INSURANCE, (FIRE,) 9, 12 to 16.
PROMISSORY NOTES, 3, 4, 5.

## PRIVILEGED COMMUNICATIONS.

*See* EVIDENCE, 3.

## PROMISSORY NOTES.

1. An agreement by an insurance company to allow five per cent on the whole amount of notes given for advanced premiums to be written against, without deduction for such sums as may be written against, is illegal, and the note cannot be recovered on, by the

company. But as the statute does not make the note void, a third person, receiving it before it became due, for a valuable consideration and without notice of the illegal agreement, will be entitled to recover. SUTHERLAND, P. J. dissented. *Chesbrough* v. *Wright,*                    28

2. But merely receiving a note in part payment of a precedent debt, does not constitute a parting with value, which will render the holder a *bona fide* holder for value.                    *ib*

3. For the purposes of protest, a collecting agent occupies the position and is held to the obligations of a holder of commercial paper. *State Bank of Troy* v. *Bank of the Capitol,*                    343

4. In the case of a bill or note, sent to a bank as agent for *collection* merely, in the absence of proof of an express contract or of commercial usage, it is not obligatory on the collecting bank to notify and duly charge *all* the prior parties to the paper, but only its own principal, or immediate indorser.                    *ib*

5. If the collecting bank undertakes to transmit notices of protest to other parties besides its immediate indorser, although this may be *some* evidence of an agreement to notify all the indorsers, it is not *sufficient* evidence of such an agreement, in the absence of proof of custom or usage.                    *ib*

6. Where a blank space is left, in a promissory note, after the word " at," in the place where the place of payment is usually mentioned, the holder of the note is authorized, by an implied authority, to fill the blank. *Kitchen* v. *Place,* 465

7. The word " at" implies that the blank space which succeeds it may be filled before the note is delivered, with a designated place of payment. And if the holder fills in a place of payment it will not discharge the indorser.                    *ib*

*See* ACTION, 1, 2.
   AGREEMENT, 1, 5, 6.
   BANKS, 1, 2.
   PRINCIPAL AND AGENT, 4, 5, 6.

## R

### RAIL ROAD COMPANIES.

1. Where the general rail road laws of Ohio declared that any rail road company might, by means of subscription to the capital stock of any other company, or otherwise, aid such company in the construction of its railroad, for the purpose of forming a connection between said last mentioned road and the road owned by the company furnishing such aid; and authorized any two or more rail road companies, whose lines were connected, to enter into any arrangement for their common benefit; *Held* that these provisions gave the power to companies whose lines of road were connected to enter into an arrangement with each other for the purpose of securing a uniform gauge of the connecting roads, and to make it a part of such arrangement that one or more of the companies should guaranty the payment of the interest coupons issued by another. *Connecticut Mutual Life Ins. Co.* v. *The Cleveland &c. Rail Road Co.* 9

2. If the guarantors, under such circumstances, have the general power to make the guaranty, it is immaterial as between third parties without notice and such guarantors, whether their acts are authorized or ratified by a vote of the stockholders, in accordance with the provisos of the general rail road statutes of Ohio; those provisos being intended for the protection of the shareholders, and relating rather to the mode or manner of the execution of the power. *ib*

3. Holders of the coupons guarantied have a right to presume that the guarantors have done their duty and have proceeded regularly, in the execution of the power. *ib*

4. Third parties dealing with a corporation are bound to know the law; that is, they are bound to take notice of the extent of its powers; but they have a right to assume, in the absence of any thing suggesting inquiry, that it has proceeded regularly in the execution of its powers. *Per* SUTHERLAND, P. J. *ib*

5. It being quite evident that when a cartman's cart and a railway car are progressing side by side in the same direction, with a space of sixteen or twenty-four inches between them, there can be no collision if each adheres to the track which the law assigns to it, in case a collision does occur, the presumption of negligence is altogether against the driver of the cart, and not against the conductor of the railway car; the former being able to deviate and depart from his track, which the latter cannot do. *Suydam* v. *The Grand Street and Newtown Rail Road Co.* 375

6. In an action against the railway company, to recover damages for injuries occasioned by the collision, the plaintiff must show that the collision proceeded exclusively from the negligent acts of the defendant, and not from his own negligent acts, or his own negligent acts combined with those of the defendant. *ib*

7. Where it appeared from the evidence, in such an action, that the collision was caused by the imprudent act of the plaintiff in pulling his horse to the left; *Held* that it could not be said he was without fault and did not contribute largely to bring about the collision resulting in his injury; and that the jury should have found a verdict for the defendant. *ib*

*See* BOND.
GUARANTY.

### RELATION.

1. The doctrine of *relation* being a fiction of law, is to be resorted to only for the advancement of justice; and has not been adopted as a rule when third persons who are not parties or privies might be prejudiced thereby. *Per* POTTER, J. *Pierce* v. *Hall,* 142

2. Whether the comptroller's deed of land sold for taxes, vests the title in the purchaser, by relation back to the time when the sale became absolute, so as to entitle him, as against a trespasser, to repossess himself of any property tortiously severed from the freehold? *Quære.* *ib*

## REPLEVIN.

Where the interest of a party entitled to the possession of personal property is of a limited nature less than the actual value of the property replevied, the jury, in an action of replevin between the actual owner and the party entitled to the possession, should be directed to assess the value of the property, only at a sum which will be equivalent to the limited interest of the defendant, therein. *Rhoads* v. *Woods*, 471

## REVIVOR OF SUIT.

1. Prior to the code there were known in the equity practice two modes of proceeding to revive a suit; one under the revised statutes, in the cases provided for by it, by summary application founded on petition or affidavit; and one by filing a bill of revivor. *Matter of Bornsdorff* v. *Lord*, 211

2. The revivor on motion, under section 121 of the code, although it has a wider range as to the cases in which it is applicable and necessary, and has a more limited period within which the motion can be made, still, in effect, stands in the place of the summary application, and the supplemental complaint stands in the place of a bill of revivor. *ib*

3. And as under the former practice it was not necessary to obtain from the court leave to file a bill of revivor, so it is now unnecessary to apply to the court, by motion, for leave to continue the action against the executor of a deceased defendant, by filing a supplemental complaint; although more than a year has elapsed since the death of the party. CLERKE, J. dissented. *ib*

# S

## SALE.

*See* EVIDENCE, 4, 5, 6, 8.

## SCHOOL COMMISSIONER.

*See* OFFICE AND OFFICER.

## SHEEP.

*See* ACTION, 4.

## SHERIFF.

1. A sheriff acquires a lien upon property levied on by him under attachments, which constitutes a qualified or special title. *Rhoads* v. *Woods*, 471

2. He is thereby authorized to take and hold possession until the demands for which the attachments were issued are paid, or until judgment and a sale of the property seized. *ib*

3. The assertion of that title, against a wrongdoer, here by a foreign sheriff, cannnot be considered as an attempt to execute the process of another state within our borders. *ib*

4. The title of a foreign assignee in bankruptcy, or *in invitium*, to personal property, is admitted here, as against the bankrupt or insolvent, and the same principles are applicable here to support the special title of a sheriff, acquired under the process and laws of another state, as against any wrongdoer, or against the defendant in the process under which the sheriff seized the property. *ib*

5. If property levied on under an attachment is taken out of the hands of the sheriff, a reasonable sum for the expenses of regaining the possession will follow the lien of the sheriff, as an incident to the performance of his duty, and to that extent he may insist upon being repaid, if he acquires possession in a lawful manner. *ib*

6. Neither a judgment creditor nor an officer is justified in using the process or authority of the court oppressively, to the injury either of the debtor or of any third person. *Cantine* v. *Clark*, 629

7. A party who directs, and the officer who makes, an oppressive levy, is responsible for the unlawful act. As regards the officer, the rule is that where a ministerial officer does any thing contrary to the duty of his office, and damage thereby accrues, an action lies. *ib*

8. Although there be no actual corruption or intentional fraud on the part of the sheriff, yet if he abuse his trust he is answerable to the law. *ib*

*See* EXECUTION, 3, 4, 5.

SLANDER OF TITLE.

1. An action lies for slander of the plaintiff's title to personal property. To maintain such an action the plaintiff must establish, 1. That the words were false; 2. That they caused an injury to him in reference to his title to the property; 3. That they were uttered maliciously, and in order to injure the plaintiff. *Like* v. *McKinstry*, 186

2. The plaintiff and defendant made a parol agreement, by which the former hired the farm of the latter, for one year from the 1st of April, 1861, with the privilege of sowing the farm to rye in the fall of 1861, and reaping the crop; the plaintiff to have the use of the barn and press, on the farm, to press the straw &c. The plaintiff sowed rye on the farm, in the fall of 1861, with the assent and assistance of the defendant. *Held* that the lease originally made was only legal and valid for one year from its commencement; but that the defendant, by assenting to, and assisting in, the sowing of the rye in the fall, sanctioned the stipulations in the lease, for the sowing and reaping of the crop, and virtually made a new agreement with the plaintiff, conceding the use of the farm for such further period as was requisite. *ib*

3. *Held, also,* that such new agreement was valid, and founded on a sufficient consideration, and gave to the plaintiff a good title to the rye, and the right to maintain an action for slander of his title. *ib*

SPECIFIC PERFORMANCE.

1. A party who is entitled to a specific performance of an agreement to release his land from the lien of a mortgage may maintain a suit in equity for that purpose, notwithstanding he has, before the filing of his bill, conveyed away the land by deed with warranty. *Bennett* v. *Abrams*, 619

2. Form of a judgment or decree for the specific performance of an agreement to satisfy and discharge a mortgage which is a lien upon the plaintiff's land, where no damage has yet been sustained by the plaintiff, and the mortgage is held by a third person, not a party to the action, and is not yet due. *ib*

3. If specific performance be impracticable, then the party may have approximate relief in some other form which will secure to him the substantial advantages of his contract. *ib*

4. County courts have jurisdiction of actions for the specific performance of contracts. *Williston* v. *Williston*, 635

5. As a general rule, to entitle a party to ask the interposition of a court of equity to enforce the specific performance of a contract, the contract must be supported by what courts of equity deem a meritorious consideration. *ib*

6. If the inadequacy of consideration be so great as to render the bargain hard or unconscionable, the court may refuse its aid to enforce the contract, and leave the parties to contest their rights at law. *ib*

7. Where G. W. the owner of premises consisting of a house and about an acre of land situated in the country, not worth over $75, on agreeing to convey the same to his brother C. W., if he would come and live with him, obtained from the latter an undertaking that he would perpetually maintain the division fences between the lot and G. W.'s farm, being three sides of the lot— a promise which was scrupulously fulfilled for more than twenty years—and on the strength of such agreement to convey to him, C. W., had made valuable improvements upon the premises; *Held* that so far from the bargain being hard and unconscionable on the part of C. W. it would be a hard rule that would pronounce the consideration grossly inadequate; and that it would be unconscionable to deprive him not only of the land but of the fruit of his labor, and of the enjoyment of his improvements. *ib*

8. In equity time is not, ordinarily, of the essence of a contract respecting real estate. It may, under certain circumstances, be made, or become so; but the general rule is that if a party has not been guilty of gross neglect; if his delay can be reasonably explained, and is consistent with good faith; and time has not been made material by the agreement of the parties, a court of equity will afford relief notwithstanding the delay. *ib*

9. It is always sufficient for a party to show that his laches has arisen from a reasonable cause, or has been acquiesced in by the other party. *ib*

10. A parol agreement for the conveyance of land will, if partly executed by the party seeking relief, be specifically enforced. *ib*

11. Where a purchaser takes possession of lands, under a parol agreement of the vendor to convey, a court of equity will decree a specific performance; especially if improvements have been made by the vendee, on the faith of the agreement. *ib*

### STATE.

*See* PARTIES, 1, 2.

### STREETS.

*See* HIGHWAYS.
MUNICIPAL CORPORATIONS.

### STOCK.

*See* FRAUDULENT REPRESENTATIONS.
PARTNERSHIP, 1, 2, 3.
PRINCIPAL AND AGENT, 1, 2, 3.

### SUMMONS.

*Service by publication—See* PRACTICE, 9, 10, 11.

*Setting aside—See* EXECUTORS AND ADMINISTRATORS, 3. PRACTICE, 11.

### SURROGATE.

1. A recovery in the supreme court, against an administrator, after a trial at law on the merits, for services rendered by the plaintiff as proctor and counsel for the administrator, in the administration of the estate, adjudges that such services constituted actual, necessary, just and reasonable expenses of the administration, which must be borne by the estate. And the surrogate has power to order the administrator to pay the amount of the judgment, although there are not sufficient assets to pay the same and all the debts of the intestate which constitute claims against his estate, in full. SUTHERLAND, J. dissented. *Matter of the estate of Thompson,* 237

2. The surrogate has the same power to direct that an execution be issued upon a judgment recovered against an administrator for liabilities incurred by him in the administration of the estate, as he has to order such process to issue upon a judgment recovered for a debt owing by the deceased. And it is his duty so to order, if the creditor shall require it. *ib*

3. The legislature, by repealing the provisions of the revised statutes, declaring that no surrogate shall, "under any pretext of incidental power or constructive authority, exercise any jurisdiction whatever, not expressly given by some statute of this state," intended that a surrogate should have the incidental power to open or correct a decree made through fraud or a mistake as to a material fact. *Doble* v. *McClaran,* 491

4. Hence if the surrogate believes a motion to open a previous decree, declaring that a will was not duly executed and attested, is made in good faith, and that it is reasonably probable, from the papers on both sides, that such decree was made under a mistake as to what the witnesses to the will had in fact sworn to, or that the witnesses, from not understanding the questions put to them, omitted to state facts material to show the due execution of the will, he has power to grant the motion, as incident to his statutory power to take the proofs as to the execution of a will and to admit the same to probate, or otherwise. *ib*

## T

### TELEGRAPH.

1. Where parties have agreed that their communications with each other shall be made by telegraph, this in effect is a warranty by each party that his communications to the other shall be received. *Trevor* v. *Wood*, 255

2. A communication by telegraph is only initiated when it is delivered to the telegraphic operator. It is completed when it comes to the possession of the party for whom it is designed. *ib*

3. The rule that has been established by the courts, in respect to contracts made by letter sent through the mail, is not applicable to communications by telegraph. *ib*

4. Telegraph companies, while conducted by private enterprise, cannot be so clothed with a public official character as to make the receipt of a communication at the office of the company of the same effect, in regard to the acceptance of an offer by a contracting party, as the actual delivery of it would have. *ib*

5. The telegraph company is the agent of the employer, while the post office is conducted by public authority and is not the agent of any person. *ib*

### TENDER.

1. S. sold a canal boat to H. for $2400, a part of which was paid down, and the balance was secured by the promissory notes of H. payable at future periods. H. was to have possession of the boat, but the title was to remain in S. until the notes were paid. In April, 1860, some of the payments due from H. being in arrear, S. directed the boat to be sold at auction. He had previously waived the technical forfeiture arising from failure to pay at the day, by accepting a payment from H. and by treating him as a purchaser still holding under his contract. Previous to the sale H. tendered to S. the amount due upon the contract. *Held* that such tender was equivalent to performance by H., and the effect of it was to take away from S. the right to proceed and sell the boat as upon a forfeiture, and to put H. in the position he occupied before any forfeiture could be claimed. *Hutchings* v. *Munger*, 396

2. *Held also*, that S. occupied substantially the position of a mortgagee or pawnee of the property, and upon H.'s failure to pay, he had a right to resume possession and sell the property—a right equivalent to that of foreclosure by a mortgagee, or sale by a pawnee ; but that right could be defeated by performance, or an offer and tender of performance, before or after the stipulated day ; such a tender standing in the place of, and being equivalent to, performance. *ib*

3. *Held further*, that H. was by his tender, remitted to his original rights, and entitled to the possession of the boat, in the same manner that he would have been upon an actual performance. And that the sale of the boat by S. was improper, and the dispossession of H. illegal. *ib*

### TRUSTS AND TRUSTEES.

Where one partner subscribes for stock for the benefit of both, signing his name individually, and not as trustee, he is not a trustee within the provisions of the general act of 1848, relative to the formation of corporations, &c. (*Laws of 1848, ch. 40, §§ 16, 24.*) *Stover* v. *Fish*, 162

## U

### UNDERTAKING.

*See* APPEAL, 2, 3, 4.

### UNITED STATES COURTS.

*See* CONSTITUTIONAL LAW.

## USURY.

1. Nothing short of a corrupt and illegal *contract* in violation of the statute will constitute usury. It must be a contract or agreement for the loan or forbearance of money, goods or things in action, by which illegal interest is reserved and taken, or agreed to be reserved or taken. Otherwise usury does not exist. *Lesley* v. *Johnson*, 359

2. The reservation of illegal interest, or the taking or agreeing to take unlawful interest, must enter into or become part and parcel of the contract, in order to bring the transaction within the prohibition of the statute. *ib*

3. When a contract for the loan of money, legal and innocent in itself, is once made and consummated, it cannot be made usurious and illegal by any subsequent transactions of the parties. *ib*

4. Though subsequent transactions may of themselves be illegal, and forbidden by law, they cannot impart the taint and the consequences of usury to an antecedent agreement, fair and just and upright in itself. *ib*

5. If the obligation under the agreement is to pay a debt, the obligation, with the legal rights resulting from it, remain in all their force, and cannot be discharged by engrafting upon it a subsequent agreement obnoxious to the charge of usury. *ib*

6. If the subsequent agreement has the effect to annul and rescind the previous agreement, a different rule will prevail. *ib*

7. Where subsequent to the execution of a bond and mortgage, the mortgagors made an agreement with B. that if he would pay the money due thereon, to the holder of the mortgage, take an assignment thereof, and execute a covenant extending the time of payment, they would pay him a bonus of $4355.55, which was acceded to by B. and was carried into effect by both parties; *Held* that the subsequent usurious agreement did not taint the

mortgage with usury, or constitute a defense to an action to foreclose the same, brought by an innocent purchaser thereof. *ib*

*See* HUSBAND AND WIFE, 14, 15.
LIMITATIONS, STATUTE OF, 9. 10, 11.

# V

## VENDOR AND PURCHASER.

1. After the vendee in an executory contract has perfected his title to lands in pursuance of it, an action of *ejectment* will not lie against him by a grantee of the sheriff by deed under a judgment against the devisee of the vendor, docketed subsequent to such contract, though such judgment was docketed while a portion of the purchase money remained unpaid, and before the vendee received his deed. *Smith* v. *Gage*, 60

2. Before a purchaser can set up, as a defense to an action on a note given as collateral security for an installment of the purchase money, the inability of the vendor to give a good title to a portion of the premises, he must surrender the possession of the premises. E. D. SMITH, J. dissented. *Lewis* v. *McMillen*, 420

3. The fact that a vendor, though he has a perfect title to four-fifths of the premises contracted to be sold, has not a perfect title evidenced by a written conveyance, for one-fifth, although it may afford a reason for rescinding the contract by the purchaser, yet it can furnish no ground for his refusing all payment, without rescinding. *ib*

4. The purchaser will be compelled either to affirm, or to disaffirm and rescind, the contract, *in toto.* He will not be allowed to affirm so much of the contract as is advantageous to himself, and enjoy all its benefits, and disaffirm and reject that which is burdensome. *ib*

5. It cannot be pretended that a purchaser has rescinded the contract,

so long as he holds the possession of the premises, under it. He must rescind by acts as well as words, or it is no rescission. *ib*

6. Where the action is not upon the contract of sale, nor between the parties to it, but upon a separate and independent promise by the purchaser and other parties, to pay the vendor the sum specified, at a particular day, before the defendants can defeat the action entirely, they must show either fraud in the transaction in which the note had its inception, or an entire want, or failure, of consideration. A partial want, or failure, of consideration cannot be alleged in bar. *ib*

7. Even if the vendors refuse to convey, if the contract is still executory on their part, such refusal is no bar to an action upon a separate note, given to secure one or more of the payments. The party must pay his note, and take his remedy upon the contract, to recover his damages for the breach. *Per* JOHNSON, J. *ib*

8. Parties signing such note as mere sureties for the purchaser, having no interest in the contract, cannot set up the breach of such contract as a defense against an action upon their promise. Their remedy is against their principal, for any sum they may be compelled to pay on the note. *ib*

9. Where the contract of sale in express terms makes the payment of the purchase money a condition precedent to the right of the purchaser to a conveyance, and in addition to this the purchaser gives his note for one of the payments, and procures other persons to sign it jointly with him, this puts the intention to make the note in the nature of an independent, promise, or a condition precedent beyond all doubt. *ib*

*See* COMPTROLLER'S SALE. WILL, 5, 6.

### VENIRE.

*See* JUSTICES' COURTS, 9, 10.

## W

## WARRANTY.

*See* EVIDENCE, 6.

## WILL.

### 1. *General rules of construction.*

1. Under the provisions of the revised statutes a will, whether it disposes of real or personal property, speaks as of the time of the testator's death. *McNaughton* v. *McNaughton*, 50

2. Where a testator devises all his real estate, in express and unambiguous words, he will be deemed to have reference to the real estate as it shall exist at the time of his death. *ib*

3. Although the introductory clause of a will, declaring the testator's intention to dispose of *all* his "*estate*" does not, of itself, enlarge a particular devise to a fee, yet it is very material to the inquiry concerning the purpose of the testator in relation to the *quantum* of the estate devised. *Charter* v. *Otis*, 525

4. It is a key to the intention of the testator; and if it shows that he intended to part with his whole interest, the subsequent words will, if possible, be so construed as to pass an estate in fee, to prevent intestacy as to any part of his property. *ib*

### 2. *Construction and effect in particular cases.*

See *McNaughton* v. *McNaughton*, 50.
*Smith* v. *Gage*, 60.
*Charter* v. *Otis*, 525.

### 3. *Revocation of.*

5. G., being the owner of a farm, and certain personal property, made his will, giving and bequeathing to his wife all his personal estate. He then gave, devised and bequeathed to his wife "all his real estate" during her life, remainder over to others. He subsequently sold and conveyed the farm to L., taking back from the grantee a bond and mortgage for a part of the purchase

money, which he held at the time of his death. *Held* that the bond and mortgage passed to the widow of the testator, as part of the personalty; it being the intent of the testator that the devise should operate only on the real estate of which he should die seised. *McNaughton* v. *McNaughton*, 50

6. *Held, also,* that if the devise were to be regarded as a devise of the farm—in effect a specific devise— then the sale and conveyance was, to that extent, a revocation of the will. *ib*

### 4. *Lost or destroyed wills, proceedings to establish.*

7. Practice, and rules of evidence, upon a proceeding under the statute, to establish the execution and validity of a will alleged to be lost or destroyed; and what will be deemed sufficient proof of the exetion, and the provisions, of the will. *Everitt* v. *Everitt*, 385

8. The proof of a lost or destroyed will proceeds upon the theory that it is not in existence and cannot be produced before the surrogate. Hence the case is one of secondary evidence exclusively. *ib*

9. Proof will also be received to supply the imperfection of memory of the subscribing witnesses. *ib*

10. A proceeding under the statute, to prove a lost will, is not within the spirit or the letter of the 52d section of the statute of limitations applicable to suits in equity, requiring bills for relief, in case of the existence of a trust not cognizable by the courts of common law &c. to be filed within ten years after the cause of action shall accrue. *ib*

## WITNESS.

1. The exclusion of the testimony of a party in his own behalf, in respect to a transaction between him and a deceased person, against the executors of the latter, specified in section 399 of the code, extends only to evidence of that character when offered against a party who has acquired title to the cause of action *immediately* from such deceased person, and not where the party has acquired such title from the decedent *mediately* or remotely. In all other cases parties are competent to testify to such facts, as much as to any other. *Prouty* v. *Eaton*, 409

2. Thus where the plaintiff in a foreclosure suit, though originally the immediate assignee of the deceased mortgagee, had assigned the mortgage to other persons, viz. the executors of the mortgagee; *Held* that he was by that assignment wholly divested of all title; and that upon the executors re-assigning the mortgage to him, his title was then derived immediately and entirely from them, and from no other person; and he stood as though he had never had any title, other than that derived from the executors; the reassignment not restoring him to his original condition of immediate assignee of the deceased mortgagee. *ib*

3. It was always competent to prove the loss or destruction of a paper, for the purpose of admitting parol evidence of its contents, by the party himself; and there is no provision of the code that operates to the exclusion of a party from thus testifying. *Williston* v. *Williston*, 635

4. A plaintiff, in an action against executors, is a competent witness to prove the contents of a lost letter. Section 399 of the code of procedure was intended to provide for the case of personal intercourse, conversations or communications had personally with the deceased, and is not applicable to testimony resting in papers or documents of any description. *ib*

*See* MALICIOUS PROSECUTION, 4.

END OF VOLUME FORTY—ONE.